UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

MOBILE REAL ESTATE, LLC and                    Docket No.:  7:19-cv-11475
JOHN LIM,

                                Plaintiffs,            **<u>COMPLAINT</u>**

            - against -                               JURY TRIAL DEMANDED

NEWPOINT MEDIA GROUP, LLC,
NEWPOINT MEDIA GROUP HOLDINGS, LLC,
THE REAL ESTATE BOOK d/b/a TREBMobileAgent,
LION EQUITY PARTNERS, LLC and
PEZ GALLO HOLDINGS, LLC,

                                Defendants.
-------------------------------------------------------------X

        The Plaintiffs, by their attorneys, SARACINO MORRIS LAW GROUP PLLC,

complaining of the Defendants, respectfully allege, upon information and belief, as follows:

<u>**INTRODUCTION**</u>

        1.      The plaintiffs MOBILE REAL ESTATE, LLC and JOHN LIM bring this action

seeking an injunction and damages for breach of contract, misappropriation of trade secrets

under Defend Trade Secrets Act (DTSA) 18 U.S.C. § 1836 *et seq.*, civil conspiracy, negligence

and unjust enrichment.

        2.      The plaintiffs have discovered that NEWPOINT MEDIA GROUP, LLC,

NEWPOINT MEDIA GROUP HOLDINGS, LLC, THE REAL ESTATE BOOK d/b/a

TREBMobileAgent, LION EQUITY PARTNERS, LLC and PEZ GALLO HOLDINGS, LLC,

(collectively "NewPoint and its owners/affiliates" or the "Defendants"), induced and wrongfully

misappropriated—blatantly "lifted"—their proprietary software application, the

Win Local™ Agent Suite (the "Application") which enabled the defendants to reap the rewards of Mobile Real Estate LLC's ("MRE's") proprietary and confidential mobile lead generation Application.

3.      After rejecting a proposed good faith merger and induced the plaintiffs to enter into, and later phase out of, the licensing contract arrangement. The defendants upper management and IT team at all times had access to the technical details and workings of the plaintiffs' confidential application, with the deliberate plan to phase out the plaintiffs and misappropriate the technology and trade secrets.

4.      NewPoint and its owners/affiliates in executing this plan to first grow its business with MRE and then phase out MRE to use MRE's proprietary Win Local™ Agent application to continue its business has breached expressly survivable elements of a licensing contract, misappropriated the plaintiffs' trade secrets and intellectual property, and has unjustly enriched themselves to the detriment of MRE and Lim in a manner that violates the fundamental principles of justice, equity, and good conscience.

5.      NewPoint and its owners/affiliates have reaped and continue to generate revenue from MRE's generation directly as a result of misappropriation and unlicensed use of intellectual property and owes the claimants significant compensation.

6.      As a result, the plaintiffs have suffered irreparable harm, actual and consequential damages and are entitled to an injunction issued by this Court enjoining the defendants' continued use of the plaintiffs' technology.

## JURISDICTION AND PARTIES

7.      The Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1332 by virtue of the diversity of citizenship of the plaintiffs and the defendants and the

fact that the amount in controversy exceeds the sum of seventy-five thousand dollars ($75,000),

exclusive of interest and costs.

8.      Further, this action in part arises in part under the Defend Trade Secrets Act

(DTSA) 18 U.S.C. § 1836 *et seq*. and thus this Court has federal question jurisdiction over the

subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a). This Court has

supplemental jurisdiction over the related claims asserted herein pursuant to 28 U.S.C. §1367.

9.      Further, this Court has personal jurisdiction over the Defendants as the

Defendants have conducted business in, and have had continuous and systematic contacts with,

the State of New York and this District.

10.     This forum is proper as the forum selection clause in the Master Services

Agreement (contract) at issue contemplates that any action may be filed in Federal Court

encompassing the County of Westchester, State of New York.

11.     At all times herein mentioned, the plaintiff MOBILE REAL ESTATE, LLC

maintained a principal place of business at 500 Summer St. #300, Stamford, CT 06901

12.     At all times herein mentioned, the plaintiff JOHN LIM was, and still is, a natural

person residing in the State of New York, County of Westchester.

13.     At all times herein mentioned, the plaintiff JOHN LIM was, and still is, and owner and officer of MOBILE REAL ESTATE, LLC.

14.     At all times herein mentioned, defendant NEWPOINT MEDIA GROUP, LLC maintained a principal place of business at 12912 Hill Country Blvd., Suite F-245 Bee Cave, TX 78738.

15.     At all times herein mentioned, defendant NEWPOINT MEDIA GROUP, LLC maintained a principal place of business at  2305 Newpoint Parkway, Lawrenceville, GA 30043.

16.     At all times herein mentioned, defendant NEWPOINT MEDIA GROUP HOLDINGS, LLC maintained a principal place of business at 12912 Hill Country Blvd., Suite F-245, Bee Cave, TX 78738.

17.     At all times herein mentioned, defendant NEWPOINT MEDIA GROUP HOLDINGS, LLC maintained a principal place of business at 2305 Newpoint Parkway Lawrenceville, GA 30043.

18.     At all times herein mentioned, defendant NEWPOINT MEDIA GROUP HOLDINGS, LLC is a Delaware limited liability company which maintained a principal place of business in Delaware, so designating Capitol Services, Inc. as authorized recipient for process service, located at 1675 S State St. Ste B, Dover, Kent, DE 19901.

19.     At all times herein mentioned, defendant THE REAL ESTATE BOOK d/b/a TREBMobileAgent maintained a principal place of business at 12912 Hill Country Blvd., Suite F-245, Bee Cave, TX 78738.

- 4 -

20.     At all times herein mentioned, defendant THE REAL ESTATE BOOK d/b/a TREBMobileAgent maintained a principal place of business at 2305 Newpoint Parkway, Lawrenceville, GA 30043.

21.     At all times herein mentioned, defendant THE REAL ESTATE BOOK TREBMobileAgent (sometimes referred to a "TREB") is a subsidiary and/or d/b/a of NEWPOINT MEDIA GROUP, LLC.

22.     At all times herein mentioned, defendant LION EQUITY PARTNERS, LLC maintained a principal place of business at 3003 East Third Avenue, Suite #201, Denver, CO 80206.

23.     At all times herein mentioned, defendant PEZ GALLO HOLDINGS, LLC is a Delaware limited liability company which maintained a principal place of business in Delaware, so designating Capitol Services, Inc. as authorized recipient for process service, located at 1675 S State St. Ste B, Dover, Kent, DE 19901.

24.     At all times herein mentioned, defendant PEZ GALLO HOLDINGS, LLC maintained a principal place of business at 8061 Paseo Arrayan, Carlsbad, CA 92009.

25.     Until about April, 2018, LION EQUITY PARTNERS, LLC was the owner of NewPoint Media Group, LLC.

26.     In or about April, 2018, LION EQUITY PARTNERS, LLC  sold NewPoint Media Group, LLC to PEZ GALLO HOLDINGS, LLC for a yet undisclosed sum.[1]

---

[1] The press release for such merger is available at https://dp.oaklins.com/newpoint-media-group-llc-a-portfolio-company-of-lion-equity-partners-has-been-sold-to-pez-gallo-holdings-llc/

## FACTUAL BACKGROUND

27.     The plaintiffs repeat and re-allege each of the foregoing allegations of paragraphs "1" through and including "26" of this Complaint with the same force and effect as if more fully set forth herein.

**(1)     THE REAL ESTATE MOBILE LEAD GENERATION MODEL**

28.     In and before 2011, Newpoint with its TREB[2] subsidiary relied solely on print media to enable its Independent Distributors (real estate advertising customers, or "end users"), roughly 150, spanning the United States and Canada, to sell homes and other realty. Today, NewPoint relies almost entirely on mobile lead generation.

29.     Its business has grown exponentially since meeting the plaintiffs MRE and John Lim. Lead generation via mobile phones, which ultimately results in sales, is *everything* in the real estate world today. It is why the defendant NewPoint and its affiliates have been able to rapidly adopt to the modern era and no longer rely solely on a pile of Penny-saver style real estate brochures near the doors of the local supermarket.

30.     Underscoring this is an email dated July 13, 2016 from an Independent Distributor wrote to the officers of defendant NewPoint:

> "[T]his program is <u>absolutely vital</u> to the success of our business going forward in this digital world. It provides us with a distinct competitive advantage over any competition. Working with Mobile Real Estate and John Lim for the last 7 years has had a very positive effect on our business. Whereas without this LSM program, it would prove very detrimental to our business and the businesses of our clients."

---

[2] THE REAL ESTATE BOOK TREBMobileAgent

- 6 -

31.     The plaintiffs by and through their innovated, confidential and proprietary technology introduced the management of NewPoint to the wonders of mobile lead generation with its Win Local™ Agent, which assigns a text message to a property, delivers a lead to an advertiser or agent through text messaging, delivers a mobile-originated lead via email to agent or advertiser, and configures, creates, and maintains an enterprise level technology system automatically integrating  large volumes of properties, advertisers, and text codes, which added substantial value and longevity to this print-focused business.

32.     In practicality, text codes associated with a real estate listing prompt home shoppers to view more detailed information about the listing, including photos, *and provide the listing agent or advertiser with real-time leads*. The splash page of https://www.trebmobileagent.com/ has two actors showing end users how it works. The claimants also pioneered the use of "vanity text codes," where independent distributors, advertisers, and other real estate professionals are able to specifically "brand" listing properties, as well as themselves through the Mobile Business Card™.

33.     The claimants' innovation drives traffic, and this is how properties sell and how substantial value is added to any non-interactive medium such as the realty catalogs found near supermarket doors.  NewPoint previously did not have any solutions which their clients could use outside of magazines and Real Estate Book URLs.  All traffic was merely driven to the book and The Real Estate Book website.  Furthermore, the complete system automation pioneered by MRE created a scalable technology model unprecedented in the realty industry.

34.     MRE and John Lim own, innovate, operate and develop technology platforms that drive sales through shortcodes and text messaging.  Here, their innovation enabled the delivery

of real estate listing and related information to mobile phones, connecting consumers and real

estate professionals, by virtue of its proprietary software platforms via various methods of

mobile communication and provides for the management and tracking of lead information as

more specifically set forth and described herein and formally called the "Win Local™ Platform"

and later called "Local Smart Mobile™."

35.     MRE and John Lim invested significant funds, and countless R&D and

engineering hours to develop Win Local™/Local Smart Mobile™ platform.

36.     MRE approached NewPoint, creating an initial partnership whereby NewPoint

leveraged MRE's realty tech to produce alternative entries such as signs and text messaging

using a Mobile Business Card which droves traffic directly to real estate agent/broker sites

bypassing TREB assets completely which was never done.

**(2)     THE COMPANY RELATIONSHIP AND NEWPOINT'S ACCESS TO MRE's
PROGRAMMING CAPABILITIES, VALUATION, ROADMAPS AND
SOURCE CODE**

37.     The defendants had access to the confidential lead generation model,

programming capabilities and source code for the application.

**(A)     The Rejected Merger Proposal**

38.     In 2013, at the early stages and upon introduction of the tech to the defendants,

the possibility of a $9.7 million merger was presented to Newpoint's ownership/upper

management. A merger was seriously and confidentially discussed, with MRE presenting a 57-

page privileged and confidential PowerPoint deck to Scott Dixon (NewPoint CEO), Stuart

Christianson (NewPoint COO), and Ari Silverman and Jim Levitas, the owners of defendant

Lion Capital Partners LLC, (blanket owners of Newpoint at the time), setting forth very

particular details of the MRE-invented software application, the Win Local™ Agent Suite, and its value to NewPoint, and a future technology roadmap.  The .ppt file containing the certain confidential tech details and certain confidential valuations was exchanged via email to Scott Dixon and Stuart Christian. Also, Rebecca Chandler, Vice President of Marketing at NewPoint on October 30, 2013 by email asked for a copy of the confidential .ppt file which was provided.

39.     NewPoint and its owner Lion Capital rejected a merger and instead decided to work by license agreement, which – as became evidenced later – was part of a scheme to phase out MRE, usurp its role, and misappropriate the tech, cutting out the developer altogether.

40.     As part of the defendants' plan following its of decision not to merge, MRE and NewPoint entered into the first Master Services Agreement dated June 1, 2013, and thus the relationship continued under a licensing arrangement. Said contract contains definitions and language with respect to "Ownership," "Restrictions on Use and Access," "Survival" and "Confidentiality."  Usage of the license was granted at $36,500/mo. (USD) compensated to MRE.

41.     During this time of partnership, MRE supported NewPoint every step of the way as NewPoint entered and gained a greater market share. MRE's application enabled NewPoint to compete against more established real estate marketing companies such as "Homes and Land"[3] which already had significant customer bases and market share. Notably, NewPoint hereafter *purchased* and merged with Homes and Land.[4]

---

[3] Ironically, NewPoint purchased and merged with Homes and Land; press release available at
https://www.oaklins.com/case-study.html?did=100411

[4] Press release available at https://www.oaklins.com/case-study.html?did=100411]

42.     Also, with respect to access of the programming capabilities, flowcharts knowledge and tech documentation MRE shared confidential information about the platform and deep details with their NewPoint's technical/IP team.  MRE was the key instrument behind how real estate data flowed from NewPoint's software system/infrastructure to the Win Local™/Local Smart Mobile™ platform.

43.     MRE provided NewPoint with information through deep integration developed by MRE programmers because MRE was the one that understood how user and real estate data got into the Real Estate Book system as well as how data is used inside the real estate space, which NewPoint had no knowledge it before its introduction MRE.

44.     Limited key employees of NewPoint had access to the confidential information, as there were mandatory monthly tech meetings in Atlanta, GA and weekly technical Skype meetings to discuss implementation and usage of Win Local™/Local Smart Mobile™.

 **(3)   THE MASTER SERVICES AGREEMENTS AND THE CALCULATED
        PHASING OUT OF MRE**

45.     As part of the defendants' plan following its decision to reject a good faith merger, MRE and NewPoint entered into a Master Services Agreement—a licensing agreement—dated June 1, 2013 which contains definitions and language with respect to "Ownership", "Restrictions on Use and Access", "Survival" and "Confidentiality." Usage of the application license was granted at $36,500/mo. (USD) compensated to MRE.

**(A)** **Application Ownership**

46.    The ownership of Win Local™/Local Smart Mobile™, referred in the contract as

the "Licensed Application," is made expressly clear:

> 4.2 Ownership.
>
> (a) Subject to the licenses granted to NPMG herein, all right, title and interest in
> and to the Licensed Application (including, without limitation, all standard,
> optional and custom enhancements, modifications, design changes and software
> updates for the duration of this Agreement and <u>thereafter in perpetuity</u>) and the
> Documentation (including, without limitation, all modifications, revisions,
> updates and supplements for the duration of this Agreement and <u>thereafter in
> perpetuity) are and shall remain at all times the sole, exclusive and proprietary
> property of MRE</u>. (emphasis supplied)

**(B)** **Protective Language**

47.    The Master Services Agreement also is clear with its restrictions on use and

access—survival language—of the Licensed Application:

> 4.4 <u>Restrictions on Use and Access</u>. Except as expressly provided herein, NPMG
> shall <u>not</u>: (i) copy or distribute the Licensed Application or the Documentation;
> (ii) modify, enhance, alter, or otherwise change the Licensed Application or the
> Documentation; (iii) merge the Licensed Application into another program
> (provided, however, that nothing contained herein shall prohibit NPMG from
> integrating TREB or other NPMG applications into, or interfacing TREB or other
> NPMG application with, the Licensed Application upon written consent by MRE
> and provided further that any integrations contemplated by a Statement of Work
> executed by both parties shall be deemed approved by MRE); (iv) create
> derivative works from the Licensed Application or the Documentation; (v) copy,
> reverse engineer, disassemble, decompile, translate, extract, reverse compile,
> reverse assemble, or make any other attempt to discover the source code of the
> Licensed Application; (vi) misappropriate or infringe any of MRE's trade secrets
> *or* Intellectual Property Rights; (vii) sell, assign, transfer, sublicense, rent, lease,
> or lend any portion of the Licensed Application or the Documentation to any third
> party except that NPMG's authorized distributors and Customers shall be
> authorized to use the Licensed Application; (viii) attempt to gain unauthorized

access to any servers controlled by MRE; or (ix) remove, obliterate or cancel from view any copyright, Mark, confidentiality or other proprietary notice, Mark or legend appearing in any of the Licensed Application or Documentation. The Licensed Application and the Documentation are protected by U.S. copyright and patent laws and international treaties. MRE reserves the right to deny access or use of the Licensed Application to any Authorized User, if MRE, in its sole discretion reasonably determines that such use violates or will violate any term or provision of the Agreement. NPMG acknowledges and agrees that if NPMG were to breach the provisions of this Section 4.4, MRE would suffer irreparable harm for which there is no adequate remedy at law. Accordingly, if NPMG directly or indirectly violates Section 4.4, MRE will be entitled, in addition to such other relief as may be appropriate, to a temporary restraining order and an injunction against NPMG and any person or entity acting on NPMG's behalf, restraining NPMG or such other person from violating any of the provisions of this Section 4.4.

48.     Thus, the intent between parties regarding fair and legal use of the licensed application was made absolutely clear in the Master Services Agreement.

49.     Importantly, a "Survival" section was also included in the contract, such that there would never be any mistake:

> 5.6  Survival. Upon termination or expiration of this Agreement for any cause or for no cause, the paragraphs which by their plain meaning, including specifically but not as a limitation provisions which protect the intellectual property rights of MRE shall survive.

Here, as discussed below, the defendants have violated survivable terms of this contract and have essentially done everything that the arms length contract forbids them to do.  The plaintiffs are owed fees (damages) for the past usage since the termination of the contract, present continued usage, and into the future.

**(C)**     **Confidentiality Clause**

50.     Further, the Master Services Agreement also contains a confidentiality provision

proving clearly that "MRE's Licensed Application shall be deemed the Confidential Information

of MRE:

> 12.1 Confidential Information. [...] For purposes hereof, MRE's Licensed
> Application shall be deemed the Confidential Information of MRE; NPMG's Content and
> any Customer Content shall be deemed the Confidential Information of NPMG and the
> terms and existence of this Agreement shall be considered the Confidential Information
> of both Parties.

> 12.2 Non-Disclosure. During and after the Term, each Party agrees to hold the
> Confidential Information of the other Party in trust and confidence and shall not
> use and/or disclose to any third party such Confidential Information without the
> prior written consent of the disclosing Party. Each Party agrees to limit internal
> access to and disclosure of the other Party's Confidential Information solely to its
> directors, officers and employees on a "need *to* know" basis for purposes directly
> related to the performance of the Party's obligations hereunder. Each Party shall
> exercise the same care in preventing unauthorized disclosure and/or use of the
> other Party's Confidential Information that it takes to protect its own proprietary
> and confidential information, but in no event less than reasonable care. Without
> limiting the foregoing, reasonable care shall be deemed to include: (a) informing
> each and every third party that is authorized *to* receive and/or have access to
> Confidential Information of the strictly confidential and sensitive nature thereof
> and requiring them to comply with these terms by obtaining their written
> acknowledgment and consent to keep such Confidential Information confidential
> on and subject to terms no less restrictive than the terms hereof and (b)
> immediately notifying the other Party of any actual, threatened or alleged
> violation or breach of the confidentiality of such Confidential Information and
> providing reasonable assistance to other Party to regain possession of the
> Confidential Information and to prevent further violations *or* breach hereof.
> During and after the Term, the Parties agree not to sell, rent, lease, transfer,
> encumber, pledge, reproduce, publish, transmit, translate, modify, reverse
> engineer, compile, disassemble, adapt, create derivative works from or otherwise
> use or allow anyone else to use, any such Confidential Information. (emphasis
> supplied)

51.    Less than a year later, in early 2014 the Defendants wished to alter the payment

terms of the Master Services Agreement.  Thus, a Second Master Services License Agreement

was executed on March 10, 2014 where the terms of consideration to MRE were changed at the

behest of NewPoint:

> Bundled Package: Commencing upon execution of this Agreement and
> continuing through July 13,2015, NPMG shall pay MRE an amount
> equal to 60% of all revenue actually received by NPMG from the
> Distributors attributable to sales to Customers of Bundled Packages
> (and not, for the avoidance of doubt, revenue (i) generated by any
> signage or other TREB store or printed revenue, or (ii) Direct Revenue)
> (the "Bundled Distributor Revenue"). After July 13, 2015 and during
> the remaining Term, NPMG shall pay MRE an amount equal to 50% of
> Distributor Revenue arising from sales of Bundled Packages.

52.    Accordingly, the payment changed from a solid monthly licensing fee to a

variable figure based on usage by Independent Distributors. Despite the change in compensation

structure, the "Ownership," "Restrictions on Use and Access", "Survival" and "Confidentiality"

with respect to the application license were in place in the Second Master Services License

Agreement.

53.    After a time based on this pay structure, NewPoint wanted to lower MRE's

payment, *still*, now that the wheels were moving (as part of this patterned intent to phase out

MRE).  NewPoint group told MRE that it wanted to move "in  a different direction." In fact, an

email on October 2, 2014 from Stuart Christianson (NewPoint COO) to MRE's John Lim, copied

to Scott Dixon (NewPoint CEO), and Susan Deese, NewPoint Vice President and General

Counsel stated:

> *John, please see the attached agreement with the date change. Scott and I need to
> communicate this change to Lion Equity **as they are of the understanding we are
> moving in a different direction.*** (emphasis added)

- 14 -

54. A period of further discussion could not fix what had broken down between the parties. On July 11, 2016, a letter was sent from John Lim to NewPoint giving 90 days required notice to cancel the Second Master Services Agreement. The letter reminded NewPoint of the protective survival language clearly protecting MRE's intellectual property and trade secrets existing in both the first and second agreements. Lim's letter re-quotes the contract's protective survival language as follows:

> Per the terms of the Agreement, 90 days from the date of this notice, all data feeds, API connections or other digital communications, mobile/web sites, textcodes, vanity codes, Mobile Business Cards(TM), QR codes, portal access, and other digital assets, products, or services described in the Agreement and provided by MRE to NPMG will be disabled and irrecoverably removed from MREs technology infrastructure.

> Referencing the Agreement and the current product provided to NPMG referred to as "Local Smart Mobile", MRE would like to remind NPMG of the terms of the Agreement, specifically portions of section 4.4 regarding same:

>> NPMG shall not: (i) copy or distribute the Licensed Application or the Documentation; (ii) modify, enhance, alter, or otherwise change the Licensed Application or the Documentation; (iii) merge the Licensed Application into another program(provided, however, that nothing contained herein shall prohibit NPMG from integrating TREB or other NPMG applications into, or interfacing TREB or other NPMG application with, the Licensed Application upon written consent by MRE and provided further that any integrations contemplated by a Statement of Work executed by both parties shall be deemed approved by MRE); (iv) create derivative works from the Licensed Application or the Documentation; (v) copy, reverse engineer, disassemble, decompile, translate, extract, reverse compile, reverse assemble, or make any other attempt to discover the source code of the Licensed Application; (vi) misappropriate or infringe any of MRE's trade secrets or Intellectual Property Rights; (vii) sell, assign, transfer, sublicense, rent, lease, or lend any portion of the Licensed Application or the Documentation to any third party except that NPMG's authorized distributors and Customers shall be authorized to use the Licensed Application; (viii) attempt to gain unauthorized access to any servers controlled by MRE; or (ix) remove, obliterate or cancel from view any copyright, Mark, confidentiality or other proprietary notice, Mark or legend appearing in any of the Licensed Application or Documentation. The Licensed Application and the Documentation are protected by U.S. copyright and patent laws and international treaties.

55.     This warning within the letter made absolutely clear to NewPoint that it could not use the tech after the termination of the agreement.

**(D)     Judy Bellack's Correspondence**

56.     In response to John Lim's letter, on July 12, 2016, NewPoint's CRO Judy Bellack shockingly sent an email to the TREB Independent Distributor Network, roughly 150 owners, which disparaged and defamed MRE.  Ms. Bellack's email contains several statements that are factually incorrect, *known to be* factually incorrect, and are purposefully misleading. Such libelous and slanderous assertions in her letter include:

- MRE's actions were "designed to create fear and attempt to strong-arm the company to meet [their] demands."

- MRE wanted to "triple…annual fees on the existing 1,000+ contracts" with "no offer of additional support."

- MRE "was unwilling to parse this out of a go-forward agreement, which would have been an easy transition."

- NewPoint had "verbally agreed with John [Lim] just yesterday morning …that we would work together on a detailed communication plan…"

- MRE "has been the source of many errors over the past years."

- "[A]ctual usage of the product is low."

57.     Not only are all of the above statements demonstrably false, they were obviously communicated with the sole intent to defame John Lim personally, as well as to damage MRE's reputation with the real estate industry—all part and parcel of the calculated scheme to lift the tech and trade secrets and continue to use the plaintiffs' model without paying compensation duly owed.

58.     Terms of a wind-down period were discussed and an amendment to the Second Master Services Agreement was executed on July 27, 2016 contemplating termination of the contract. It provides that MRE shall be solely responsible for providing text codes to Independent Distributor customers who are then using Local Smart Mobile "LSM."

59.     The amendment provides that MRE and NewPoint agree to continue working under the second Master Services Agreement and thereby extended the Terms of the Agreement until January 31, 2017.  Expressly, the Master Services Agreement remained in full force and effect and expressly did not alter the Ownership, Restrictions on Use and Access, Survival and Confidentiality of the Master Services Agreements. To this end, the amendment reads at para. 13: "Except as modified hereby, the Agreement remains in full force and effect." Thus, the sections on misappropriation, survival and confidentially were not altered whatsoever. There is no waiver of the misappropriation/reverse engineering clause whatsoever.

**(4)     BREACH AND MISAPPROPRIATION**

60.     After the contract wound down, and MRE was out of the picture, Newpoint went far beyond a simple lead generation program as contemplated, but incredibly copied the exact, full proprietary product built by MRE, including not only text code lead generation, but integration of IDX data, automatic assignment of property codes (down to the detail of prefixing the automatically generated text code with a letter), automatic lead routing, automatic page and URL creation for tracking of clicks, system development for seamless large-scale integration into print publication, CRM functionality, taking an address - geocoding it - and linking location

- 17 -

based lookup derived from click routing the right lead to the right person (SmartSigns[TM] technology).[5]   MRE's role was usurped.

61.   Beyond that, NewPoint completely lifted John Lim's proprietary and patented Mobile Business Card technology as is thoroughly described in Newpoint's marketing materials and website, used by key executives in their email signatures and referenced as slight variants of the Mobile Business Card.

62.   Following the rejected merger and during the term of agreement, NewPoint represented to MRE that it would respect and safeguard the proprietary and confidential nature of MRE's information.  MRE believed that NewPoint would continue to work with MRE to remain focused on quality and to continue to grow their business. This trust was clearly breached upon the continued use of the licensed application.

63.   NewPoint breached the trust that MRE had reposed in NewPoint. Unbeknownst to MRE, on information and belief, NewPoint engaged in a deliberate plan to phase out MRE with its contract changes and its representation to "move in a different  direction" per Stuart Christianson, COO's email cited above.

64.   Curiously, NewPoint demanded that MRE cease communication with the Independent Distributor network upon termination, likely because there was an intent to continue with the unlawful use of the licensed application, and NewPoint didn't want the plaintiffs finding out. They found out nonetheless.

65.   NewPoint had not invested R&D, countless hours and money in developing the application.  In short, upon information and belief, NewPoint sought to take MRE's intellectual

---

[5]These elements more than distinguishing MRE's product form the vanilla provider.

property and use it for itself, phasing out the developer and licensor.  As part of its plan to misappropriate MRE's application, upon information and belief, NewPoint engaged in a campaign to copy MRE's application for the purpose of reaping the rewards all to itself.

66.    NewPoint in executing on this plan to first grow its business with MRE and then phase out MRE has (i) misappropriated MRE's trade secrets and other confidential information, (ii) directly and indirectly infringed MRE's exclusive rights to use and reproduce the application, and has unjustly enriched itself to the detriment of MRE in a manner that violates the fundamental principles of justice, equity, and good conscience.

### (A)    Open and Obvious Examples of Misappropriated Use

67.    After the contract wound down, NewPoint went well beyond the contemplated terms and violated the claimants' proprietary rights.  They continued to use the *entire* technology and no compensation has been paid for the unlicensed use.  Some examples as of the date of this writing are outwardly obvious, including but not limited to:

A.    The Real Estate Book Home & Lifestyle Guide Media Kit (aka the "Digital Storybook") at page 6 showing in diagram form with images the proprietary technology of MRE still being used by NewPoint.

   *See* http://www.trebworks.com/PDFS/DigitalStorybook.pdf at p.6

B.    The Real Estate Book Home & Lifestyle Guide Media Kit (aka the "Digital Storybook") at page 7 showing an image mimicking exactly MRE's patented Mobile Business Card technology, as well as describing the proprietary process, down to the fine detail of calling it a "Vanity Text Code." The only thing changed is that instead of a Mobile Business Card$^{TM}$, NewPoint now calls it a Digital Business Card. It incredibly reads: "*Share all of your contact info with potential customers through your Digital Business Card*."

   *See* http://www.trebworks.com/PDFS/DigitalStorybook.pdf at p.7

C.   The advertised Independent Distributor (end-user) quotes on the Real Estate Book Home & Lifestyle Guide Media Kit at p. 15 are also telling:

> *I appreciate ate the hard work and dedication that Cirita and Brandon put into The Real Estate Book®. I have been advertising in The Real Estate Book® for several years. **It has been one of my main lead generation sources.** It brings buyers to my listings AND it seals the deal when I meet with sellers. Not many brokers advertise in print and that is exactly why I do! The Real Estate Book® makes Pink Dot Properties and my listings stand out. **With The Real Estate Book® online and text codes, the reach is far beyond print**. If you are looking for a strong ROI and amazing client service, you need to meet with Cirita!*

See http://www.trebworks.com/PDFS/DigitalStorybook.pdf at p.15 [First bold sentence: emphasis in original; second bold sentence: emphasis supplied.]

Another quote reads:

> *As a second year agent, I have closed 52 homes with over $17 million sales in one year! In addition, I won Top REALTOR® in the Top Agent Missouri Edition magazine. I attribute a lot of my success to Herman & Diane Page with The Real Estate Book®. Their hard work and tools used to showcase my business; **such as the business card app**, marketing presentation and hands-on assistance has made me the successful agent I am today. I am very grateful for Herman and Diane with The Real Estate Book*

See http://www.trebworks.com/PDFS/DigitalStorybook.pdf at p.15 [Emphasis supplied.]

D.   The splash page of https://www.trebmobileagent.com/ has two actors showing in video format experiencing one of the technology routines provided by NewPoint by MRE.

E.   The defendants have audaciously renamed Local Smart Mobile$^{TM}$ to "TREB Mobile Agent."
See generally https://www.trebmobileagent.com/

68.     NewPoint to this date treats the proprietary technology, trade secrets, and intellectual property as if it was handed over them on a silver platter for indefinite use with no consideration whatsoever.  MRE has sustained monetary losses due to unlicensed use of its tech and intends to recover the same.  NewPoint has been, and continues to be unjustly enriched. The agreements between NewPoint and MRE granted a license for limited use of the plaintiffs' proprietary application.  NewPoint has went well beyond contemplated use and clearly breached the survivable terms of the agreements.

69.     The plaintiffs' technology allowed for unprecedented growth for NewPoint.  They conspired a way to stop paying the plaintiffs because they knew they needed the tech to sustain their growth. The licensed application and its elements continue to be used without due compensation.

## AS AND FOR A FIRST CLAIM FOR RELIEF
### Breach of Contract

70.     The plaintiffs repeat and re-allege each of the foregoing allegations of paragraphs "1" through and including "69" of this Complaint with the same force and effect as if more fully set forth herein.

71.     The defendants have breached the survivable elements of the Master Services Agreement that contemplate defendants' behavior and protects the plaintiffs' application until the end of time. Said Agreement contains definitions and language with respect to Ownership, Restrictions on Use and Access, Survival and Confidentiality. [See para. 45-55, *supra*.]

- 21 -

72.     The defendants have ignored the Ownership element of the contract, which expressly provides that "all right, title and interest in and to the Licensed Application (including, without limitation, all standard, optional and custom enhancements, modifications, design changes and software updates for the duration of this Agreement and <u>thereafter in perpetuity</u>) and the Documentation (including, without limitation, all modifications, revisions, updates and supplements for the duration of this Agreement and <u>thereafter in perpetuity) are and shall remain at all times the sole, exclusive and proprietary property of MRE</u>." (emphasis supplied).

73.     By continuing the use the application without compensating the plaintiffs, the defendants have ignored and breached this Ownership provision.

74.     Further, the defendants did indeed "misappropriate or infringe any of MRE's trade secrets *or* Intellectual Property Right" as the contract provides in Section 4.4 and to this day owed the plaintiff fees (damages) for continued use of the revenue-generating application.

75.     We remind the Court that the contract so expressly contemplates and injunction and damages:

> "NPMG acknowledges and agrees that if NPMG were to breach the provisions of this Section 4.4 [the Restrictions on Use and Access section], MRE would suffer irreparable harm for which there is no adequate remedy at law. Accordingly, if NPMG directly or indirectly violates Section 4.4, MRE will be entitled, in addition to such other relief as may be appropriate, to a temporary restraining order and an injunction against NPMG and any person or entity acting on NPMG's behalf, restraining NPMG or such other person from violating any of the provisions of this Section 4.4."

76.     Thus, the intent between parties regarding fair and legal use of the licensed application was made absolutely clear in the Master Services Agreements. Here, the defendants

have violated survivable terms of this contract and have essentially done everything that the arms length contract forbids them to do.

77.     As to the Amendment to the Master Services Agreement contemplating the wind-down, the Amendment reads at para. 13: "Except as modified hereby, the Agreement remains in full force and effect." The sections on ownership, restrictions on use and access, copying and confidentially are not altered whatsoever. There is *expressly* no waiver of those sections.

78.     Accordingly, the plaintiffs are entitled to a permanent injunction and damages.

**AS AND FOR A SECOND CLAIM FOR RELIEF**
**Violation of the Defend Trade Secrets Act (DTSA) 18 U.S.C. § 1836 *et seq.***

79.     The plaintiffs repeat and re-allege each of the foregoing allegations of paragraphs "1" through and including "78" of this Complaint with the same force and effect as if more fully set forth herein.

80.     As discussed above, the Win Local™ Platform, later called "Local Smart Mobile™ and audaciously at some point renamed to "TREB Mobile Agent" by the defendants once the plaintiff were out of the picture, was developed and owned by the plaintiffs at great expense in money and time. [See para. 31-36, 65 *supra*.] The development, ownership, restrictions and confidential nature of the application were spelled out expressly in the Master Services Agreement. [See para. 45-55, *supra*.]

81.     The confidential and proprietary business and technical information, which included its trade secrets is and was used in interstate and foreign commerce. The Real Estate Book Independent Distributor Network, roughly 150 owners that utilized and utilize this product for real estate sales, span the United States and Canada. [See para. 28, *supra*.]

82.     NewPoint was given access to MRE's trade secrets, including but not limited to the programming capabilities, flowcharts knowledge, source code and technical documentation during (1) the exchange of the confidential .ppt file – the Power Point deck - to the officers of NewPoint and Lion Equity (where MRE's tech was highlighted, as well as the method by which MRE leveraged and intended to leverage its intellectual property to create a competitive advantage over its competitors); (2) deep details shared with NewPoint's tech/IP team;(3) mandatory monthly tech meetings in Atlanta, GA; and (4) technical Skype meetings. [See para. 37-45, *supra*.]

83.     The application and its details – how it worked in the real estate lead generation world – was confidential, and such confidentiality so there would be no question was reduced to writing  in the Master Services Agreement. [See para. 50, *supra*, quoting the confidentiality provision.]

84.     Further, we again reference the Ownership and Restrictions on Use and Access sections of the Master Services Agreements cited above, applicable to the protections afforded by the Defend Trade Secrets Act (DTSA) 18 U.S.C. § 1836.

85.     The defendants by copying and using the exact, full proprietary product built by MRE, including not only text code lead generation, but integration of IDX data, automatic assignment of property codes (down to the detail of prefixing the automatically generated text code with a letter), automatic lead routing, automatic page and URL creation for tracking of clicks, system development for seamless large-scale integration into print publication, CRM functionality, taking an address - geocoding it - and linking location based lookup derived from click routing the right lead to the right person, the means by which text codes were generated

within TREB's backend system, how leads were routed, how unique text codes were created per property automatically and in a scalable fashion, the use of vanity codes—and profiting from the same—the defendants have breached the DTSA.

86.     Further, how NewPoint completely lifted the proprietary and patented Mobile Business Card as is thoroughly described in Newpoint's marketing materials and  website, used by key executives in their email signatures and referenced as slight variants of the Mobile Business Card), and hereby referencing the Open and Obvious Examples of Misappropriated Use shown above, the defendants have breached the DTSA. [See para. 67, *supra*.]

87.     Accordingly, the plaintiffs are entitled to a permanent injunction and damages.

## AS AND FOR A THIRD CLAIM FOR RELIEF
### Civil Conspiracy
### (As To All Defendants *Except* Pez Gallo Holdings, LLC[6])

88.     The plaintiffs repeat and re-allege each of the foregoing allegations of paragraphs "1" through and including "87" of this Complaint with the same force and effect as if more fully set forth herein.

89.     The underlying claim forming the basis of this Civil Conspiracy is the intent to violate the plaintiffs' trade secrets and intellectual property. Upon information and belief the defendants NEWPOINT MEDIA GROUP, LLC, NEWPOINT MEDIA GROUP HOLDINGS, LLC, THE REAL ESTATE BOOK d/b/a TREBMobileAgent, LION EQUITY PARTNERS,

---

[6] Defendant Pez Gallo Holdings, LLC entered the picture by buying NewPoint in 2018, after the conspiracy claim arisen, and thus not a defendant to this claim for relief.

LLC and certain officers, directors and owners[7] conspired to violate the plaintiffs' trade secrets and intellectual property. [See para. 37-45, *supra*.]

90.    Under the auspices of evaluating the purchase of MRE, and in working with MRE's John Lim, his partners and staff - in the training and collaboration with said defendants' employees, tech team and independent contractors, NP took a complete detailed analysis of MRE and its product only to use it after MRE was phased out.

91.    NP continued to the lower the terms of compensation to MRE until MRE was ultimately forced out, all part of a detailed conspired plan. We again note the October 2, 2014 email from Stuart Christianson (NewPoint COO) to MRE's John Lim, copied to Scott Dixon (NewPoint CEO), and Susan Deese, NewPoint Vice President and General Counsel which stated that the company wanted to move in a different direction: "*John, please see the attached agreement with the date change. Scott and I need to communicate this change to Lion Equity **as they are of the understanding we are moving in a different direction.**"* There was no different direction only misappropriation. [See para. 53, *supra*.]

92.    Accordingly, the plaintiffs are entitled to damages.

## AS AND FOR A FOURTH CLAIM FOR RELIEF
### Negligence

93.    The plaintiffs repeat and re-allege each of the foregoing allegations of paragraphs "1" through and including "92" of this Complaint with the same force and effect as if more fully set forth herein.

---

[7] See *id*.

94.     In the event the defendants, its officers, owners, employees agents, including were not intentional and willful in their conduct to misappropriate plaintiffs' IP, and were so oblivious to misappropriation of trade secrets, then they were legally negligent and reckless in wrongfully believing that they could continue the use of the application without duly compensating the plaintiffs.

95.     The defendants owed duty of care to the plaintiffs to not infringe on their property rights, ownership and trade secrets, and to not breach confidentiality. The defendants, their owners, directors, officers, employees and agents in their errors and omissions breached that duty in their continuing use without remitting compensation to the plaintiffs. Such breach was a proximate cause of the plaintiffs' economic damages.

## AS AND FOR A FIFTH CLAIM FOR RELIEF
### Unjust Enrichment

96.     The plaintiffs repeat and re-allege each of the foregoing allegations of paragraphs "1" through and including "93" of this Complaint with the same force and effect as if more fully set forth herein.

97.     The defendants, for all the reasons set forth in this Complaint, unjustly enriched themselves to the detriment of MRE in a manner that violates the fundamental principles of justice, equity, and good conscience.

98.     Accordingly, the plaintiffs are entitled to damages including a disgorgement of profits; an award of all of the gains, profits and advantages received by the defendants as a result of its wrongful conduct.

## GOOD FAITH INTENT

99.     The plaintiffs having made a good faith intent to resolve this matter prior to the filing of this Complaint, and such intent not proving fruitful, this action has become necessary.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiffs respectfully seek that judgment be entered for Plaintiffs and against the Defendants as follows:

(a)     An Order preliminarily and permanently enjoining NewPoint, its officers, owners, agents, servants, employees, its affiliated companies, its assigns and successors in interest, and those persons acting in concert or participating with them, from continued acts of infringement of the plaintiffs' property at issue in this litigation;

(b)     An Order preliminarily and permanently enjoining NewPoint, its officers, owners, agents, servants, employees, its affiliated companies, its assigns and successors in interest, and those persons acting in concert or participating with them, from continued acts of misappropriation of MRE's trade secrets;

(c)     An Order preliminarily and permanently enjoining NewPoint, its officers, owners, agents, servants, employees, its affiliated companies, its assigns and successors in interest, and those persons acting in concert or participating with them, from continued reproduction and continued use of the MRE's application;

(d)     Monetary damages resulting from the defendants' intentional, wrongful and/or negligence;

(e)     Past, present and future royalties for use of the application;

(f)      Entry of judgment holding NewPoint liable for trade secret misappropriation;

(g)      Disgorgement of profits: an award of all of the gains, profits and advantages received by the defendants as a result of its wrongful conduct;

(h)      Enhancement of damages arising from NewPoint's willful and malicious misappropriation of trade secrets, pursuant to Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836 *et seq.*;

(i)       Exemplary/punitive damages;

(j)      An award of attorneys' fees;

(k)      MRE's costs incurred in this action;

(l)      Pre-judgment interest;

(m)      Post-judgment interest;

(n)      Such other and further legal and equitable relief as may be available under law and which the Court may deem proper.

## <u>DEMAND FOR JURY TRIAL</u>

The plaintiffs hereby demand a trial by jury on all claims in the Complaint properly triable by jury.

Dated:  Harrison, New York
        December 16, 2019

Respectfully submitted,

_____
Gregory Saracino, Esq.
SARACINO MORRIS LAW GROUP PLLC
Attorneys for Plaintiff
600 Mamaroneck Ave, Suite 400
Harrison, NY 10528
(914) 335-3330 – Tel.
(914) 801-5907 – Fax
gsaracino@SMLAWGRP.com