UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MOBILE REAL ESTATE, LLC, *et al.*,

                              Plaintiffs,

            v.

NEWPOINT MEDIA GROUP, LLC, *et al.*,

                              Defendants.

No. 19-CV-11475 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Gregory Saracino, Esq.
Saracino Morris Law Group PLLC
Harrison, NY
*Counsel for Plaintiffs*

Frederick L. Whitmer, Esq.
Kilpatrick Townsend & Stockton LLP
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

        Plaintiffs Mobile Real Estate, LLC ("MRE") and John Lim, a founding partner of MRE

("Lim"; with MRE, "Plaintiffs"), bring this Action against Defendants NewPoint Media Group,

LLC ("NewPoint"); NewPoint Media Group Holdings, LLC ("NewPoint Holdings"); The Real

Estate Book d/b/a TREBMobileAgent ("TREB"); Lion Equity Partners, LLC ("Lion"); and Pez

Gallo Holdings, LLC ("Pez Gallo"; collectively, "Defendants"), claiming breach of contract,

violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, civil conspiracy,

negligence, and unjust enrichment in connection with Defendants' alleged misappropriation of

Plaintiffs' proprietary software application.  (*See generally* Am. Compl. (Dkt. No. 11).)  Before

the Court are the Parties' competing Motions regarding arbitration.  Plaintiffs seek to stay and/or

vacate arbitration, ("Plaintiffs' Motion"), while Defendants move to compel arbitration, stay this Action, or both, ("Defendants' Motion"; with Plaintiffs' Motion, the "Motions"). (*See* Pls.' Not. of Mot. (Dkt. No. 13); Defs.' Not. of Mot. (Dkt. No. 20).)

For the reasons explained herein, Defendants' Motion is granted in part and denied in part, and Plaintiffs' Motion is denied.

<u>I.  Background</u>

<u>A.  Factual Background</u>

The following facts are taken from the Amended Complaint, and the declarations and exhibits submitted in connection with the Motions. (Am. Compl.; Decl. of Gregory Saracino, Esq. in Supp. of Pls.' Mot. ("Saracino Decl.") (Dkt. No. 14); Aff. of John Lim in Supp. of Pls.' Mot. ("Lim Aff.") (Dkt. No. 15); Decl. of Frederick L. Whitmer, Esq. in Supp. of Defs.' Mot. ("Whitmer Decl.") (Dkt. No. 21); Decl. of Eric Loeffel in Supp. of Defs.' Mot. ("Loeffel Decl.") (Dkt. No. 22); Reply Decl. of Gregory Saracino, Esq. in Further Supp. of Pls.' Mot. ("Saracino Reply Decl.") (Dkt. No. 29)).[1]  The Court recounts only the facts that are relevant to the instant Motions.

<u>1.  The Parties</u>

During the relevant period, MRE maintained a principal place of business in Stamford, Connecticut. (Am. Compl. ¶ 11.)  Lim, owner and officer of MRE, resides in Westchester

---

[1] "Courts deciding motions to compel [arbitration] apply a standard similar to that applicable for a motion for summary judgment." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (citation and quotation marks omitted). Thus, the Court may "consider[] all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits." *Id.* (citation, alterations, and quotation marks omitted); *see also Philippe v. Red Lobster Rests. LLC*, No. 15-CV-2080, 2015 WL 4617247, at *2 (S.D.N.Y. Aug. 3, 2015) ("It is . . . proper (and in fact necessary) to consider extrinsic evidence when faced with a motion to compel arbitration . . . ." (citation and quotation marks omitted)).

County, New York.  (*Id.* ¶¶ 12–13.)  NewPoint Holdings, Lion, and Pez Gallo are beneficial owners of NewPoint, and TREB is a "trade name used by NewPoint in connection with its operation of its TREB real estate sales promotion magazine."  (Loeffel Decl. ¶ 13.)  Plaintiffs aver that Lion was the owner of NewPoint until April 2018, when it sold NewPoint to Pez Gallo. (Am. Compl. ¶¶ 25–26.)  Also according to Plaintiffs, NewPoint Holdings is a Delaware limited liability company which maintains principal places of business in Delaware; Bee Cave, Texas; and Lawrenceville, Georgia.  (*Id.* ¶¶ 16–18.)  Plaintiffs label TREB as a "subsidiary and/or d/b/a of NewPoint" that, along with NewPoint, has principal places of business in Bee Cave, Texas and Lawrenceville, Georgia.  (*Id.* ¶¶ 14–15, 19–21.)  Pez Gallo is a Delaware limited liability company with principal places of business in Delaware and Carlsbad, California, and Lion maintains a principal place of business in Denver, Colorado.  (*Id.* ¶¶ 22–24.)

Plaintiffs "own, innovate, operate, and develop technology platforms that drive sales through shortcodes and text messaging," (*id.* ¶ 34), and "provide[] an array of consulting and . . . internet data exchange [] aggregation and search technology to large scale real estate portals that drive real estate sales nationwide," (Lim Aff. ¶ 3).  According to Lim, the "WinLocal™ platform" developed by MRE is MRE's "absolute bread and butter."  (*Id.* ¶¶ 8, 10.)  This platform "enable[s] the delivery of real estate listing and related information to mobile phones . . . and provides for the management and tracking of lead information."  (Am. Compl. ¶ 34.)  Specifically, the technology "assigns a text message to a property, delivers a lead to an advertiser or agent through text messaging, delivers a mobile-originated lead via email to agent or advertiser, and configures, creates, and maintains an enterprise level technology system automatically integrating large volumes of properties, advertisers, and text codes."  (*Id.* ¶ 31.) These "text codes" prompt individuals looking for homes to view detailed information about

home listings, and give listing agents or advertisers "real-time leads." (*Id.* ¶ 32 (italics omitted).) Plaintiffs state that prior to executing agreements with them, NewPoint "did not have any solutions which their clients could use outside of magazines and Real Estate Book URLs," and "relied solely on print media." (*Id.* ¶¶ 28, 33.) Conversely, today, NewPoint "relies almost entirely on mobile lead generation." (*Id.* ¶ 28.)

## 2.  The Service Agreements and Amendments

In June 2013, NewPoint and MRE entered into a Master License and Services Agreement (the "First Services Agreement"). (*See* Saracino Decl. Ex. E ("First MSA") (Dkt. No. 14-5).)[2] According to Plaintiffs, the First Services Agreement "provided a license for [MRE's] MREID platform as well as a host of consulting services," which included "maintenance of mobile website, upgraded reporting, advertising guidelines, continuing education and training, advertiser webinars, and introducing mobile advertising." (Lim Aff. ¶ 7.)[3]  The First Services Agreement included a section on "[d]ispute [r]esolution," that set forth:

> In the event of any dispute, claim, question, or disagreement arising from or relating to this [First Services] Agreement or the breach thereof, the Parties shall use commercially reasonable efforts to settle the dispute, claim, question, or disagreement.  To this effect, they shall consult and negotiate with each other in good faith and, recognizing their mutual interests, attempt to reach a just and equitable solution satisfactory to both Parties.  If they do not reach such a solution within a period of sixty (60) days, then, upon notice by either Party to the other, all disputes, claims, questions, or differences shall be finally settled by arbitration

---

[2] Plaintiffs assert that in 2013, MRE and NewPoint "seriously and confidentially discussed" the possibility of a merger, which NewPoint and Lion subsequently rejected, deciding instead to "work under a contract arrangement."  (Am. Compl. ¶¶ 38–39.)

[3] The First Services Agreement provided that NewPoint sought to "access and use the MREID version 3.0 Platform in connection with the administration, deployment[,] and management of its mobile smartphone initiatives, and/or desire[d] to engage MRE to perform certain services as set forth in the [First Services Agreement]."  (First MSA ¶ 1.4.)  Such technology and services included, inter alia, an "[u]dated MREID online platform," "[b]uild[ing] and maintenance [of a] [m]obile [w]ebsite," "[l]ocation[-]based advertising guidelines," and the "[i]ntroduc[tion] [of] [m]obile [a]dvertising."  (*Id.* ¶ 4.2.)

conducted in Lawrenceville, Georgia and administered by the [American Arbitration Association] in accordance with the provisions of its Commercial Arbitration Rules.

(First MSA ¶ 12.4.)

According to Lim, NewPoint subsequently decided to "expand the services and more deeply integrate MRE's tech[nology] with the more expansive WinLocal™ platform." (Lim Aff. ¶ 8.) Thus, on March 10, 2014, NewPoint and MRE executed a Second Master License and Services Agreement (the "Second Services Agreement"). (*See* Saracino Decl. Ex. F ("Second MSA") (Dkt. No. 14-6).) The Second Services Agreement took "several weeks" to negotiate in a process that involved the companies; their lawyers; Susan Deese ("Deese"), NewPoint's in-house counsel; and Scott Dixon ("Dixon"), NewPoint's chief executive officer ("CEO"). (Lim Aff. ¶ 10.) An earlier e-mail from Dixon to Lim attaching a draft of the Second Services Agreement stated, "[A]ttached is the agreement for our new relationship called[] Second Master[,] and an amendment [t]o our existing relationship . . . . I look forward to our next step together." (Saracino Decl. Ex. J ("Feb. 19, 2014 Lim E-Mail") (Dkt. No. 14-10).)

The Second Services Agreement "provided use and access to MRE's proprietary software platforms, including WinLocal™ Agent Platform that enables the delivery of real estate listing and related information to mobile phones . . . and provides for the management and tracking of lead information." (Am. Compl. ¶ 44 (emphases omitted).) This Agreement also included, inter alia, "creation of mobile, desktop[,] and tablet websites, providing data feeds containing real estate listings in the United States and Canada, custom single property websites, digital ad creation automated for use in e[-]mail and postlets, PDF property flyers, customizable Gateway

Apps™, . . . GPS enabled vanity text codes for sign riders, and . . . access to the source code."

(*Id.* ¶ 45 (emphasis omitted).)[4]

The Second Services Agreement did not include a provision mandating arbitration. (*See generally* Second MSA.)  Instead, it included a clause stating

> The [P]arties agree that any actions arising under th[e] [Second Services] Agreement shall be brought exclusively in the applicable state or federal courts located in Westchester County, New York.  Each Party agrees to submit itself to the jurisdiction and venue of such courts for the purposes of any such action.

(*Id.* ¶ 13.6.)  According to Lim, MRE did not want to arbitrate in the event of a dispute, and did not want to litigate in Lawrenceville, Georgia, which is the location Deese originally included when the arbitration clause was deleted from the Second Services Agreement.  (Lim Aff. ¶ 10; *see also* Saracino Decl. Ex. K ("Draft Second MSA") (showing that an earlier draft of the Second Services Agreement provided that the Parties would be governed by the laws of the state of Georgia, and any actions arising under the Agreement would be brought in state or federal courts in Lawrenceville, Georgia) (Dkt. No. 14-11).)  Thus, Plaintiffs "insisted that New York law would govern, and that any dispute would be heard in a New York court."  (Lim Aff. ¶ 5.) The Second Services Agreement also included a non-compete clause, which was not included in

---

[4] The Second Services Agreement specifically stated that NewPoint "desire[d] to access and use the Licensed Application in connection with the administration, deployment[,] and management of its mobile smartphone initiatives, and/or desire[d] to engage MRE to perform certain services . . . in order to create and market a total mobile services offering for TREB." (Second MSA 1.)  The Second Services Agreement stated that MRE would provide NewPoint "with access to the Licensed Application" and would "acquire, service, integrate, and manage two new short codes in [NewPoint's] name, for exclusive use by [NewPoint], and on [NewPoint's] behalf."  (*Id.* ¶¶ 3.1–3.2.)  Services provided by MRE included, inter alia, "[c]reation of [] unique mobile, desktop[,] and tablet websites with a unique url, mobile business card, [and] vanity key word[] for each [c]ustomer," and that MRE would "[a]cquire and provide to [r]eal [e]state [p]rofessional data feeds containing real estate listings from a substantial number of multiple listing services in the United States and Canada."  (*Id.* ¶ 3.3.)

the First Services Agreement, and upon which NewPoint "insisted."  (*Id.* ¶ 13; Am. Compl.

¶ 49.)  Finally, the Second Services Agreement set forth that

> Th[e] [Second Services] Agreement constitutes the entire agreement between the
> Parties with respect to the subject matter hereof, and supersedes any and all
> agreements or understandings, whether written or oral, between the Parties with
> respect to such subject matter.

(Second MSA ¶ 13.14.)  According to Plaintiffs, the "subject matter" referred to "[P]laintiff[s']

proprietary technology: the WinLocal$^{\text{TM}}$ Agent Platform and its interface."  (Pls.' Mem. 5.)

According to Eric Loeffel ("Loeffel"), CEO of NewPoint and NewPoint Holdings, and manager

of Pez Gallo, after execution of the Second Services Agreement, the Parties also continued to

perform under the First Services Agreement.  (Loeffel Decl. ¶ 7.)

   On April 1, 2014, MRE and NewPoint executed an amendment to the First Services

Agreement (the "First Amendment"), which "modified existing services and payment."  (Lim

Aff. ¶ 14; *see* Saracino Decl. Ex. G ("Apr. 1, 2014 Amendment"), at 1 (Dkt. No. 14-7).)[5]  The

First Amendment stated that "[a]n additional second agreement is being entered into

contemporaneously herewith in order for the parties to jointly provide expanded services to their

clients."  (*Id.*)  According to Lim, this "expanded service[] was the shared use of the proprietary

WinLocal platform."  (Lim Aff. ¶ 14.)  The First Amendment also provided that the First

Services Agreement "[e]xcept as modified[,] . . . remain[ed] in full force and effect."  (Apr. 1,

2014 Amendment ¶ 5.)

   On October 13, 2014, MRE and NewPoint executed another amendment to the First

Services Agreement (the "Second Amendment"), which "address[ed] term and pricing for the

MREID license" governed by the First Services Agreement.  (Lim Aff. ¶ 15; *see* Saracino Decl.

---

[5] NewPoint Holdings, Lion, Pez Gallo, and TREB are not parties to any of the
agreements or amendments described herein.  (Loeffel Decl. ¶ 12.)

Ex. H ("Oct. 13, 2014 Amendment") (Dkt. No. 14-8).)  The Second Amendment again clarified

that the First Services Agreement "remain[ed] in full force and effect."  (*Id.* ¶ 4.)  In 2015 and

2016, NewPoint paid MRE approximately $245,833 pursuant to the First Services Agreement.

(Loeffel Decl. ¶ 7.)[6]

      On July 11, 2016, Lim sent NewPoint a letter stating that MRE planned to terminate the

Second Services Agreement.  (Loeffel Decl. Ex. C ("July 11, 2016 Lim Letter") (Dkt. No. 22-

3).)  On July 27, 2016, MRE and NewPoint executed an amendment to the Second Services

Agreement (the "Wind-Down Agreement"), under which they "agree[d] to a 60-day wind down

and transition period."  (Saracino Decl. Ex. I ("Wind-Down Agreement") ¶ 3 (Dkt. No. 14-9).)

The Wind-Down Agreement stated that "MRE and [NewPoint] . . . agree to cancel the [First]

Services Agreement dated June 1[,] 2013 and all associated amendments."  (*Id.* ¶ 1.)  MRE and

NewPoint "agree[d] to continue working under the [Second Services] Agreement and thereby

extend[ed] the [t]erm of the [Second Services] Agreement until June 31, 2017 based on the terms

contained in th[e] [Wind-Down Agreement]," and clarified that except as modified in the Wind-

Down Agreement, the Second Services Agreement "remain[ed] in full force and effect."  (*Id.*

¶¶ 6, 13.)[7]  According to Loeffel, on or by October 1, 2016, "all TREB short codes—for both the

Local Smart Mobile program offered by MRE and the NewPoint-offered short code programs—

---

[6] Plaintiffs do not dispute that they have been paid for services rendered under the First
Services Agreement, but contend that they have not been "duly compensated" for the technology
that they allege Defendants misappropriated under the Second Services Agreement.  (Lim Aff.
¶ 16.)  Plaintiffs aver that their claims "lie in th[is] tech[nology]."  (*Id.*)

[7] Further, "[i]n consideration of th[e] [Wind-Down Agreement], MRE and
[NewPoint] . . . agree[d] to release, hold harmless, and forever discharge each other . . . of and
from any claim, demand, cause of action whatsoever, of every kind and nature, whether presently
known or unknown, asserted or unasserted, arising out of or relating directly or indirectly, to the
[Second Services] Agreement and any or all amendments thereto or any agreement or event
related thereto, . . . executed or occurring prior to the date of th[e] [Wind-Down Agreement]."
(Wind-Down Agreement ¶ 12.)

were transferred to short codes purchased and offered by NewPoint through a short code provider." (Loeffel Decl. ¶ 10.)  In accordance with the Wind-Down Agreement, "TREB independent distributors had the option of selling either the Local Smart Mobile program directly through MRE or selling the mobile marketing program developed by NewPoint." (*Id.* ¶ 11.) However, by December 31, 2018, MRE "unilaterally terminated its agreement to offer Local Smart Mobile to TREB independent distributors." (*Id.*)

### 3.  Plaintiffs' Allegations

In their Amended Complaint, Plaintiffs allege that Defendants "induced and wrongfully misappropriated . . . their proprietary software application, the WinLocal™ Agent Suite (the 'Application') . . . which enabled . . . [D]efendants to reap the rewards of [MRE's] proprietary and confidential mobile lead generation Application." (Am. Compl. ¶ 2.)  Plaintiffs further claim that Defendants "breached expressly survivable elements of . . . the Second [Services Agreement], . . . misappropriated . . . [P]laintiffs' trade secrets and intellectual property, and . . . unjustly enriched themselves to the detriment of MRE and Lim[,] . . . and owe[] [Plaintiffs] significant compensation." (*Id.* ¶¶ 4–5.)

Plaintiffs claim that after execution of the Second Services Agreement, NewPoint gained access to the "platform source code," which included "highly proprietary tech[nology] plus knowledge and trade secrets of MRE's core platform," and also had access to MRE's "proprietary software platforms, including [the] WinLocal™ Agent Platform." (*Id.* ¶¶ 43–44.) Also following the Second Services Agreement, Plaintiffs allege that NewPoint "had deep access [to] the programming capabilities, source code, flowcharts[,] knowledge[,] and tech[nology] documentation," and that MRE "shared confidential information about the platform and deep details with . . . NewPoint's technical [intellectual property] team." (*Id.* ¶ 55.)

In their Amended Complaint, Plaintiffs also cite "key terms" of the Second Services Agreement that they allege clearly set forth Plaintiffs' ownership of the application, restrictions on use and access of the application, relevant confidentiality provisions, and changes in payment terms from the First Services Agreement.  (*Id.* ¶¶ 57–58, 61–62.)  Plaintiffs allege that NewPoint breached "the survivable elements of the Second . . . Services Agreement," (*id.* ¶ 82), by "cop[ying] the exact, full proprietary product and source code built by MRE and addressed in the Second [Services Agreement]" and "completely lifted . . . Lim's proprietary and patented Mobile Business Card technology," (*id.* ¶¶ 70–71 (emphasis omitted)).  Plaintiffs claim that NewPoint did not pay "for the unlicensed use."  (*Id.* ¶ 77.)  The alleged breached contractual provisions include those related to ownership and misappropriation or infringement on trade secrets and/or intellectual property rights.  (*Id.* ¶¶ 83–86.)  Further, Plaintiffs allege that Defendants violated the DTSA, (*id.* ¶¶ 90–98), engaged in civil conspiracy, (*id.* ¶¶ 99–103), were negligent, (*id.* ¶¶ 104–06), and were unjustly enriched to the detriment of MRE, (*id.* ¶¶ 107–09).

### 4.  Attempted Arbitration

On December 20, 2019, four days after Plaintiffs filed their original Complaint in this Action, (*see generally* Compl.), Defendants filed a Demand for Arbitration with the American Arbitration Association ("AAA") in Atlanta, Georgia (the "Demand"), seeking a "[d]eclaratory judgment to determine that [Defendants'] use of the short code text messaging technology it independently developed is not a breach of the parties' terminated license agreement, is not a violation of the [DTSA], did not unjustly enrich [Defendants], and does not constitute negligence by [Defendants]," (Saracino Decl. Ex. B ("Defs.' Arbitration Demand"), at 1 (Dkt. No. 14-2)).  Defendants sought a hearing in Lawrenceville, Georgia, which they represented in the Demand as the "[l]ocale provision included in the contract."  (*Id.*)  Plaintiffs "repeatedly requested" that

the AAA delay the arbitration based on this Action, but the AAA rejected Plaintiffs' requests. (Whitmer Decl. ¶ 4 (citing *id.* Ex. A ("Jan. 17, 2020 AAA Letter") (Dkt. No. 21-1); *id.* Ex. B ("Feb. 7, 2020 AAA E-Mail") (Dkt. No. 21-2)).)  On January 10, 2020, Plaintiffs filed an Answering Statement and Application for Dismissal (the "Answering Statement"), pursuant to AAA rules.  (Saracino Decl. ¶ 12; *id.* Ex. D ("Answering Statement") (Dkt. No. 14-4).) According to Plaintiffs, they were "forced under protest" to file this Statement.  (Saracino Decl. ¶ 12.)  In the Answering Statement, Plaintiffs "den[ied] all claims" and requested that the AAA, inter alia, "[d]ismiss[] the arbitration demand as the matter is not arbitrable," and "[s]tay[] arbitration pending a ruling from [this Court] on whether the matter is arbitrable."  (Answering Statement 1.)  Plaintiffs have also responded to requests for information from the AAA and "ranked arbitrators' resumes[,] all under strenuous protest."  (Saracino Decl. ¶ 12 (quotation marks omitted).)

On February 18, 2020, Plaintiffs informed the AAA that they "respectfully decline[d] to arbitrate th[e] matter and w[ould] take no further action without an Order from [this Court] mandating that the parties proceed with arbitration."  (Whitmer Decl. Ex. C ("Feb. 19, 2020 AAA E-Mail"), at 2 (Dkt. No. 21-3).)  Counsel for Defendants objected to Plaintiffs' message, and on February 19, 2020, the AAA determined that the arbitration would proceed.  (*Id.* at 1–2.) According to counsel for Plaintiffs, on March 4, 2020, he received an e-mail and invoice from AAA for a balance of $1,237.50.  (Saracino Reply Decl. ¶ 3; *id.* Ex. A ("Mar. 4, 2020 AAA E-Mail") (Dkt. No. 29-1).)

B.  Procedural Background

Plaintiffs filed their original Complaint on December 16, 2019.  (Compl.)  On January 9, 2020, Plaintiffs filed an Amended Complaint.  (Am. Compl.)  On February 6, 2020, the Court

held a Pre-Motion Conference at which it set a briefing schedule for the instant Motions.  (*See*
Dkt. (minute entry for Feb. 6, 2020); Dkt. No. 12.)  Pursuant to this schedule, Plaintiffs filed
their Motion To Vacate and/or Stay Arbitration on February 18, 2020.  (Pls.' Not. of Mot.;
Saracino Decl.; Lim Aff.; Pls.' Mem. of Law in Supp. of Pls.' Mot. ("Pls.' Mem.") (Dkt. No.
16).)

On February 19, 2020, Plaintiffs filed a letter explaining that both Defendants and the
AAA were proceeding with administration of the arbitration and requesting that the Court issue
an order "temporarily staying the arbitration until . . . the Court decides the [M]otions."  (Letter
from Gregory Saracino, Esq. to Court (Feb. 19, 2020) ("Feb. 19, 2020 Saracino Letter") (Dkt.
No. 17).)  On February 20, 2020, Defendants opposed this request, after being directed by the
Court to respond to Plaintiffs' letter.  (Dkt. No. 18; Letter from Frederick L. Whitmer, Esq. to
Court (Feb. 20, 2020) ("Feb. 20, 2020 Whitmer Letter") (Dkt. No. 19).)  On the same day,
Defendants filed their Motion To Compel Arbitration.  (Defs.' Not. of Mot.; Whitmer Decl.;
Loeffel Decl.; Defs.' Mem. of Law in Support of Defs.' Mot. ("Defs.' Mem.") (Dkt. No. 23).)

After directing another response from Plaintiffs, (Dkt. No. 24), which Plaintiffs filed on
February 21, 2020, (Letter from Gregory Saracino, Esq. to Court (Feb. 21, 2020) ("Feb. 21, 2020
Saracino Letter") (Dkt. No. 25)), the Court issued an Order on February 21, 2020, granting
Plaintiffs' request for a temporary stay of arbitration pending the Court's resolution of the
Motions or further order from the Court.  (*See* Order (Dkt. No. 26).)

On February 27, 2020, the Parties filed Oppositions to each Motion.  (Pls.' Mem. of Law
in Opp'n to Defs.' Mot. ("Pls.' Opp'n") (Dkt. No. 27); Defs.' Mem. of Law in Opp'n to Pls.'
Mot. ("Defs.' Opp'n") (Dkt. No. 28).)  On March 5, 2020, the Parties filed their Replies.
(Saracino Reply Decl.; Pls.' Reply Mem. of Law in Further Supp. of Pls.' Mot. ("Pls.' Reply

Mem.") (Dkt. No. 30); Defs.' Reply Mem. of Law in Further Supp. of Defs.' Mot. ("Defs.'
Reply Mem.") (Dkt. No. 31).)  On March 6, 2020, Defendants sought leave to file a sur-reply,
arguing that Plaintiffs improperly raised an argument for their first time in their Reply.  (Letter
from Frederick L. Whitmer, Esq. to Court (Mar. 6, 2020) ("Mar. 6, 2020 Whitmer Letter") (Dkt.
No. 32).)  After Plaintiffs replied to Defendants' Letter, (Letter from Gregory Saracino, Esq. to
Court (Mar. 6, 2020) ("Mar. 6, 2020 Saracino Letter") (Dkt. No. 33)), the Court granted
Defendants' request on March 9, 2020, (Dkt. No. 34).  On March 12, 2020, Defendants filed a
Sur-Reply.  (Defs.' Sur-Reply in Opp'n to Pls.' Mot. ("Defs.' Sur-Reply Mem.") (Dkt. No. 35).)

## II.  Discussion

### A.  Legal Standard

The Federal Arbitration Act ("FAA") provides that an arbitration agreement "shall be
valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the
revocation of any contract."  9 U.S.C. § 2.  The FAA "embodies the national policy favoring
arbitration and places arbitration agreements on equal footing with all other contracts."  *Buckeye
Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006).  However, "the FAA does not
require parties to arbitrate when they have not agreed to do so."  *Nicosia v. Amazon.com, Inc.*,
834 F.3d 220, 229 (2d Cir. 2016) (citation and quotation marks omitted); *see also AT & T Techs.,
Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) ("[A]rbitration is a matter of
contract[,] and a party cannot be required to submit to arbitration any dispute which he has not
agreed so to submit." (citations and quotation marks omitted)).

Defendants move to compel arbitration and Plaintiffs move to "stay/vacate arbitration."
(Pls.' Mem. 1.)  In the context of such Motions, courts "appl[y] a standard similar to that
applicable for a motion for summary judgment."  *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d

Cir. 2003) (citations omitted).  A court must therefore "consider all relevant, admissible evidence submitted by the parties" and "draw all reasonable inferences in favor of the non-moving party." *Nicosia*, 834 F.3d at 229 (citations and quotation marks omitted).  Under this standard, the Court evaluates "[a]llegations related to the question of whether the parties formed a valid arbitration agreement . . . to determine whether they raise a genuine issue of material fact." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012) (citations omitted).  "If there is a genuinely disputed factual issue whose resolution is essential to the determination of the applicability of an arbitration provision, a trial as to that issue will be necessary . . . ." *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011) (citation omitted); *see also* 9 U.S.C. § 4 ("If the making of the arbitration agreement . . . [is] in issue, the court shall proceed summarily to the trial thereof.").  However, "where the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [a court] may rule on the basis of that legal issue and avoid the need for further court proceedings." *Wachovia Bank*, 661 F.3d at 172 (citation and quotation marks omitted); *see also* 9 U.S.C. § 4 ("[U]pon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."); *Ryan v. JPMorgan Chase & Co.*, 924 F. Supp. 2d 559, 561–62 (S.D.N.Y. 2013) ("[A] [c]ourt must grant a motion to compel arbitration if the pleadings, discovery materials before the [c]ourt, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law." (citations omitted)).

B.  Analysis

    1.  Arbitrability of the Dispute

The Parties' dispute essentially concerns the "question of arbitrability," i.e., "whether the parties have submitted [this] particular dispute to arbitration." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (citations, italics, and quotation marks omitted).  A question of arbitrability is a "term of art covering 'disputes about whether the parties are bound by a given arbitration clause,' as well as 'disagreements about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy.'" *Pincaro v. Glassdoor, Inc.*, No. 16-CV-6870, 2017 WL 4046317, at *5 (S.D.N.Y. Sept. 12, 2017) (alterations omitted) (quoting *Howsam*, 537 U.S. at 84).  To answer this question, courts in the Second Circuit generally "follow a two-part test," whereby they consider "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011) (citation omitted); *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) (noting that a court "should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement nor (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is at issue" (citation and emphasis omitted)).

The Parties also dispute *who* should determine the issue of arbitrability—the Court or the arbitrator.  "The law generally treats arbitrability as an issue for judicial determination 'unless the parties clearly and unmistakably provide otherwise.'" *NASDAQ OMX Grp., Inc. v. UBS Secs., LLC*, 770 F.3d 1010, 1031 (2d Cir. 2014) (quoting *Howsam*, 537 U.S. at 83).  With respect to this question, "[t]he proper inquiry is whether there is *clear and unmistakable evidence* from

the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrators." *All. Bernstein Inv. Research & Mgmt., Inc. v. Schaffran*, 445 F.3d 121, 125 (2d Cir. 2006) (emphasis in original) (citation, alteration, and quotation marks omitted).  If such evidence exists, the Court shall apply an arbitration clause or agreement "to all disputes within its scope unless . . . the validity challenge is to the [arbitration] clause itself or . . . the party disputes the formation of the contract." *Doctor's Assocs., Inc. v. Kirksey*, No. 18-CV-963, 2018 WL 6061573, at *4 (D. Conn. Nov. 20, 2018) (alterations and quotation marks omitted) (quoting *Granite Rock Co.*, 561 U.S. at 298–99).

"[W]hen . . . parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."  *Contec Corp. v. Remote Sol., Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005) (citations omitted); *see also Henry Schein Inc. v. Archer & White Sales Inc.*, 139 S. Ct. 524, 529 (2019) ("When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract.").  With respect to jurisdiction, the AAA Commercial Arbitration Rules (the "AAA Rules") provide that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."  American Arbitration Association, *Commercial Arbitration Rules and Mediation Procedures* ("AAA Rules") R-7(a) (July 1, 2016), https://adr.org/sites/default/files/Commercial%20Rules.pdf.  The AAA Rules further provide that "[t]he arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part.  Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract."  *Id.* at R-7(b).  Thus, "when the parties explicitly

incorporate into an arbitration agreement the [AAA Rules]," this serves as "clear and unmistakable evidence" of the intent to delegate questions of arbitrability. *Katsoris v. WME IMG, LLC*, 237 F. Supp. 3d 92, 104 (S.D.N.Y. 2017) (citation and quotation marks omitted); *see also Gwathmey Siegel Kaufman & Assocs. Architects, LLC v. Rales*, 518 F. App'x 20, 21 (2d Cir. 2013) ("[B]y incorporating the [AAA Rules,] the parties agreed to have the arbitrators decide arbitrability."); *Paduano v. Express Scripts, Inc.*, 55 F. Supp. 3d 400, 415 (E.D.N.Y. 2014) ("[V]irtually every circuit to have considered the issue has determined that incorporation of the [AAA] . . . [R]ules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." (alteration and quotation marks omitted) (collecting cases)). "[A] signatory to a contract containing an arbitration clause and incorporating by reference the AAA Rules may not disown its agreed-to obligation to arbitrate *all* disputes, including the question of arbitrability." *Katsoris*, 237 F. Supp. 3d at 104–05 (emphasis in original) (quotation marks omitted) (quoting *Contec*, 398 F.3d at 211).

Before determining who decides arbitrability, however, the Court must determine the initial validity of the agreement to arbitrate. *See Henry Schein*, 139 S. Ct. at 530 (stating that a court may not decide arbitrability issues if the agreement delegates arbitrability to an arbitrator *and* if a valid agreement exists); *see also Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26, 30 (2d Cir. 2001) ("If the making of the agreement to arbitrate is placed in issue—as [the party resisting arbitration] attempts to do by alleging that the contracts in which the arbitration provisions are found never came into existence—the court must set the issue for trial."); *Iota Shipholding Ltd. v. Starr Indem. & Liab. Co.*, No. 16-CV-4881, 2017 WL 2374359, at *6 (S.D.N.Y. May 31, 2017) ("[E]ven the broadest arbitration clause cannot bind a party who *never* agreed to it." (emphasis added) (citations and quotation marks omitted)). "[I]f a party

challenges the formation *or* execution of the contract, it is the court's role to determine whether a contract exists." *Nicosia v. Amazon.com, Inc.*, No. 14-CV-4513, 2017 WL 10111078, at *16 n.32 (E.D.N.Y. Aug. 18, 2017) (emphasis in original) (citation and quotation marks omitted), *adopted by* 384 F. Supp. 3d 254 (E.D.N.Y. 2019).  For example, courts must resolve challenges to issues of a contract's formation and challenges "directed specifically to the validity of . . . delegation provision[s] [themselves]." *Doctor's Assocs.*, 2018 WL 6061573, at *4 (citing *Rent-A-Ctr, W., Inc. v. Jackson*, 561 U.S. 63, 71–72 (2010)).

Here, the Parties do not "claim[] that there had at no time existed as between the [P]arties any contractual relation whatever" with respect to the First Services Agreement.  *Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.*, 462 F.2d 673, 676 (2d Cir 1972) (quotation marks omitted) (collecting cases).  Instead, the Parties agree that the First Services Agreement was executed on June 1, 2013.  (Saracino Decl. ¶ 18; Lim Aff. ¶ 7; Loeffel Decl. ¶ 3.)  *See Isaacs v. OCE Bus. Servs., Inc.*, 968 F. Supp. 2d 564, 569 (S.D.N.Y. 2013) (noting that because the plaintiff had "signed, dated, and spelled out his name" on a policy, he was bound by the policy, despite his argument that the agreement was invalid and unenforceable).  Thus, "there is no issue of fact as to whether any agreement between [the Parties] was ever concluded." *Doctor's Assocs.*, 2018 WL 6061573, at *6 (quotation marks omitted) (quoting *Rent-A-Ctr.*, 561 U.S. at 70 n.2).[8]

---

[8] A number of the cases cited by Plaintiffs relate to the *initial* validity of agreements to arbitrate, and thus are distinguishable from this Action.  *See, e.g.*, *Schnabel*, 697 F.3d at 113 (finding that the parties did not agree to arbitrate when the plaintiffs had insufficient notice of the arbitration agreement); *Dedon GmbH v. Janus et Cie*, No. 10-CV-4541, 2010 WL 4227309, at *7 (S.D.N.Y. Oct. 19, 2010) (finding that the court, and not the arbitrator, was to determine arbitrability because the parties disputed whether they had entered into the agreement at issue in the first place, as one of the parties had not signed it), *aff'd*, 411 F. App'x 361 (2d Cir. 2011).

However, Plaintiffs argue that because their Action falls under the purview of the Second Services Agreement, which includes a forum selection clause instead of an arbitration provision, and because the arbitration provision in the First Service Agreement was "contracted away as part of the [P]arties' dealing" and "changed to a New York [c]ourt venue," no valid arbitration clause exists that could govern their claims.  (Pls.' Mem. 1, 3–5.)  In particular, Plaintiffs argue that the Second Services Agreement supersedes the agreement to arbitrate in the First Services Agreement, particularly with respect to the "subject matter" of the Second Services Agreement, which Plaintiffs contend is the basis of this Action.  (*Id.* at 4–5.)

"Whether the forum-selection clause in the [Second Services] Agreement supersedes the arbitration clause in the [First Services] [A]greement[] presents a question of arbitrability." *TAPCO Underwriters, Inc. v. Catalina London Ltd.*, No. 14-CV-8434, 2014 WL 7228711, at *2 (S.D.N.Y. Dec. 8, 2014) (citing, inter alia, *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*, 764 F.3d 210, 214 (2d Cir. 2014)).  Here, it is clear from the First Services Agreement that the Parties delegated the issue of arbitrability to the arbitrator, as the Agreement reads that "all disputes, claims, questions, or differences shall be finally settled by arbitration conducted in Lawrenceville, Georgia and administered by the [AAA] in accordance with the provisions of [the AAA] Rules."  (First MSA ¶ 12.4.)  The Second Circuit and numerous district courts within it have found that similarly worded provisions "clearly and unmistakably" delegate the issue of arbitrability to an arbitrator.  *See, e.g., Contec Corp.*, 398 F.3d at 208 (finding that an arbitration clause stating that controversies "shall be determined by arbitration held in the City of Albany, New York in accordance with the [AAA Rules]" clearly and unmistakably delegated the issue of arbitrability to the arbitrator); *Offshore Expl. & Prod. LLC v. Morgan Stanley Private Bank, N.A.*, 986 F. Supp. 2d 308, 312 (S.D.N.Y. 2013) (same, with respect to a provision stating that

disputes or breaches "shall be determined by arbitration administered by the [AAA] in accordance with [the AAA Rules] (record citation omitted)), *aff'd*, 626 F. App'x 303 (2d Cir. 2015); *cf. TAPCO Underwriters*, 2014 WL 7228711, at *3 (finding that the question of whether a forum selection clause superseded earlier arbitration agreements was not arbitrable because, among other issues, the agreements at issue did not incorporate the rules of an arbitral body to which the court noted "a different standard [would] appl[y]").  Thus, the Court agrees with Defendants that the First Services Agreement delegates issues of arbitrability to the arbitrator, of which the effect of the forum selection clause in the Second Services Agreement is one.

The Court finds that a recent decision by Judge Seibel is analogous and instructive.  *See generally Policy Admin. Sols., Inc. v. QBE Holdings, Inc.*, No. 15-CV-2473, 2019 WL 4126464 (S.D.N.Y. Aug. 30, 2019).  There, the plaintiffs argued that there was "no . . . operative agreement" to arbitrate their copyright claims because those claims "f[e]ll squarely" under a later-executed confidentiality agreement instead of an earlier-executed license agreement.  *Id.* at *6 (record citations and quotation marks omitted).  While the license agreement contained an arbitration clause providing that, with respect to "dispute[s] relating to th[e] [a]greement, the parties . . . agree[d] to binding arbitration . . . . pursuant to the [AAA] Rules," the later confidentiality agreement contained a "[g]overning [l]aw provision" providing that "[t]he courts of the State of New York . . . shall have the exclusive jurisdiction to hear and decide an[y] . . . dispute or controversy concerning th[e] [a]greement," and a merger clause providing that the "[a]greement shall supersede and prevail over any other prior agreements . . . as to . . . [c]onfidential[] [i]nformation . . . [and] constitutes the entire agreement . . . on the subject matter."  *Id.* at *1–2 (record citations, alterations, and quotation marks omitted).  Here, too, the forum selection clause provides that "any actions arising under the [Second Services] Agreement

shall be brought exclusively in . . . state or federal courts located in Westchester County, New York," and the merger clause states that the Second Services Agreement "constitutes the entire agreement between the Parties with respect to the subject matter hereof, and supersedes any and all agreements or understandings . . . with respect to such subject matter."  (Second MSA ¶¶ 13.6, 13.14.)

As Plaintiffs claim here, the plaintiffs in *Policy Administration Solutions* argued that the forum selection clause superseded the license agreement, rendering its arbitration provision inoperable, and that the claims at issue were not arbitrable because they fell under the confidentiality agreement instead.  2019 WL 4126464, at *6.  Judge Seibel "decline[d] to decide whether [the] [p]laintiff's claims [we]re arbitrable," concluding that "[w]hether the forum-selection clause . . . supersede[d] the arbitration clause . . . present[ed] a question of arbitrability," and that the issue of whether the plaintiff's claim "f[e]ll[] within the scope of [the] arbitration clause [wa]s a question of arbitrability" as well.  *Id.* at *6–7 (citations and quotation marks omitted).  Thus, because the initial agreement incorporated the AAA Rules, whether the plaintiff's claims were subject to arbitration "[wa]s a matter of the [initial] [a]greement's continued existence, validity, and scope," and was therefore subject to arbitration under the arbitration clause.  *Id.* at *7 (footnote, alteration, and quotation marks omitted) (quoting *Contec Corp.*, 398 F.3d at 211); *see also Offshore Expl.*, 986 F. Supp. 2d at 316–17 (concluding that the plaintiff's arguments that its claim fell under a later agreement, which contained a non-exclusive forum selection clause and no arbitration provision, was delegable to the arbitrator because the

initial agreement was broad and incorporated the AAA Rules).  This Court adopts the same

conclusion here.[9]

Further, the Court is not persuaded that the Second Services Agreement rendered the

arbitration provision in the First Services Agreement invalid.[10]  "[A]n agreement to arbitrate is

_____

[9] Plaintiffs cite to the Second Circuit's recent decision in *Metropolitan Life Insurance Company v. Bucsek*, 919 F.3d 184 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 256 (2019), to assert that there is a "public policy of preventing parties from being dragged into arbitration and thus surrendering the right of access to a court without . . . consenting."  (Pls.' Mem. 10–11; *see also* Pls.' Opp'n 13; Pls.' Reply Mem. 4.)  However, in *Metropolitan Life*, the agreement at issue incorporated rules of the National Association of Securities Dealers ("NASD"), which later merged with parts of the New York Stock Exchange to become the Financial Industry Regulatory Authority ("FINRA").  919 F.3d at 195.  The Second Circuit found that not only had the claims at issue arisen "years after both parties to the dispute had severed all connections with the NASD," but also that the NASD rule cited for "support for an inference of contractual intent to confer arbitrability on the arbitrators [wa]s only moderate," when that rule empowered arbitrators "to interpret and determine the applicability of all provisions of the Code."  *Id.* (quotation marks omitted).  Conversely, here, the AAA Rules explicitly provide that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim," AAA Rules R-7(a), and the Second Circuit has determined that "[w]hen . . . parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator," *Contec Corp.*, 398 F.3d at 208 (citations omitted) (addressing specifically the incorporation of AAA Rules).

[10] While the issue of "[w]hether the forum-selection clause in the [Second Services] Agreement supersedes the arbitration clause in the [First Services] [A]greement presents a question of arbitrability," *TAPCO Underwriters*, 2014 WL 7228711, at *2 (citation omitted), Second Circuit precedent also suggests that the question of whether an agreement to arbitrate "remains in force in light of a later-executed agreement" that contains a forum selection clause is a "dispute[] concerning whether an agreement to arbitrate has been made," and thus the presumption of arbitrability is not applicable, *Goldman, Sachs & Co.*, 764 F.3d at 215 (footnote, citation, and quotation marks omitted); *see also Offshore Expl.*, 626 F. App'x at 306–07 (finding that the district court did not err in ruling that arbitrability was arbitrable after analyzing whether the arbitration provision in an earlier agreement was superseded by the forum selection clause in a later agreement); *Applied Energetics, Inc. v. NewOak Capital Mkts.*, 645 F.3d 522, 526 (2d Cir. 2011) (stating that the district court erred in applying a presumption of arbitrability because the dispute over the superseding effect of a forum selection clause concerned "whether an agreement to arbitrate ha[d] been made").  Therefore, because it is for this Court to decide "whether a valid arbitration agreement exists," *Henry Schein, Inc.*, 139 S. Ct. at 530 (citation omitted), the Court also considers the effect of the forum selection clause on the original arbitration provision herein.

superseded by a later-executed agreement containing a forum selection clause if the clause specifically precludes arbitration." *Goldman, Sachs & Co.*, 764 F.3d at 215 (citation and quotation marks omitted).  Such a clause specifically precludes arbitration when it is "all-inclusive and mandatory," as opposed to "complementary to the agreement to arbitrate."  *Id.* at 215–16 (citations and quotation marks omitted).  "[T]here is no requirement that the forum selection clause mention arbitration in order to supersede an arbitration clause." *TAPCO Underwriters*, 2014 WL 7228711, at \*3 (quotation marks omitted) (quoting *Goldman, Sachs & Co.*, 764 F.3d at 215).

Although the Second Services Agreement requires that certain actions be brought "exclusively" in Westchester County courts and provides that the Agreement "supersedes any and all agreements or understandings," (Second MSA ¶¶ 13.6, 13.14), which is language that is "all-inclusive and mandatory" in some circumstances, *see, e.g.*, *Goldman, Sachs & Co.*, 764 F.3d at 216; *Applied Energetics*, 645 F.3d at 526, the Second Services Agreement is not so broad as to completely preclude and supersede the First Services Agreement, particularly because the Agreements cover different subject matter.  Indeed, Plaintiffs contend that the Second Services Agreement was formed to "*expand* the services" provided to NewPoint by MRE.  (Lim Aff. ¶ 8 (emphasis added); *see also* Apr. 1, 2014 Amendment 1 ("An additional second agreement is being entered into contemporaneously . . . in order for the [P]arties to jointly provide expanded services to their clients.").)  *See TAPCO Underwriters*, 2014 WL 7228711, at \*3 (noting that, in determining whether a forum selection clause supersedes an arbitration clause, the "relevant question . . . is whether the . . . clauses cover the same subject matter" (citations omitted)); *Medtech Prods. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 793 (S.D.N.Y. 2008) ("[A] subsequent agreement supersedes only those terms of the earlier contract that are of the same subject

matter." (citation and quotation marks omitted)); *cf. Applied Energetics*, 645 F.3d at 526 ("Under New York law, it is well established that a subsequent contract regarding the *same* matter will supersede the prior contract." (emphasis added) (citation, alteration, and quotation marks omitted)). As in *TAPCO Underwriters*, here, the "subject matter of [the forum selection] clause [in the Second Services Agreement] is restricted by the phrase 'this Agreement,'" 2014 WL 7228711, at *4 (record citation omitted), while the broadly-phrased arbitration provision in the First Services Agreement covers "any dispute, claim, question, or disagreement arising from or relating to th[e] [First Services] Agreement," (*see* First MSA ¶ 12.4). *See also Dome Tech., LLC v. Golden Sands Gen. Contractors, Inc.*, No. 16-CV-1607, 2017 WL 5071264, at *6 (D. Conn. Nov. 3, 2017) ("[A]t a minimum, the [forum selection] clause at issue . . . would not bring within its reach 'any dispute' between the parties, or 'all actions or proceedings,' but rather a subset of the claims that might arise.").[11] Indeed, even with the Second Services Agreement in existence, the Parties continued to operate under the First Services Agreement as well, executing two amendments to that Agreement specifically stating that "the [First Services] Agreement remains in full force and effect." (Apr. 1, 2014 Amendment ¶ 5; Oct. 13, 2014 Amendment ¶ 4.) Thus, the forum selection clause in the Second Services Agreement is not all-inclusive of any claims

---

[11] When deciding the issue of arbitrability, "[t]he Second Circuit has directed courts to classify arbitration clauses as either broad or narrow." *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 99–100 (S.D.N.Y. 2015) (citing *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 172 (2d Cir. 2004)). Here, the arbitration clause in the First Services Agreement covers "any dispute, claim, question, or disagreement arising from or relating to this Agreement," (First MSA ¶ 12.4), which is "the paradigm of a broad clause," *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995) (citation omitted). Such a clause is "broader than one covering all claims and disputes arising under the contract," such as the clause in the Second Services Agreement. *Spinelli*, 96 F. Supp. 3d at 100 (citation, alteration, and quotation marks omitted); *see also Armor All/STP Prods. Co. v. TSI Prods., Inc.*, 337 F. Supp. 3d 156, 168 (D. Conn. 2018) ("[A]n arbitration clause covering claims 'relating to' a contract is broader than a clause covering claims 'arising out of' a contract." (citation omitted)).

between the Parties, and both the First and Second Services Agreement "admit[] the possibility of the other," *Applied Energetics*, 645 F.3d at 525.

The structure of these agreements stands in contrast to the contracts in *Applied Energetics*, where the parties' relationship was governed by a single contract requiring that "any dispute arising out of th[e] [a]greement" would be adjudicated in New York courts, that the agreement "constitute[d] the entire understanding and agreement between the parties," and that "no other agreements or understandings" applied. *Id.* at 523–24 (brackets and quotation marks omitted). The arbitration clause at issue in *Applied Energetics* had appeared in an earlier agreement which "specifically contemplated that the parties would enter into a subsequent, more formal agreement setting forth the terms and conditions contained in the [original] agreement." *Id.* at 523 (quotation marks omitted). Thus, the later agreement with the forum selection clause displaced the earlier agreement with the arbitration provision. *See also Goldman, Sachs & Co.*, 764 F.3d at 215–17 (finding that a forum selection clause superseded FINRA's arbitration rules and rejecting the argument that the agreements at issue did not cover the "entire relationship[]" between the parties).

Here, the forum selection clause and the arbitration provision "function[] only to identify the agreed upon dispute resolution mechanism for the specific contract in which the clause is embedded, not for the parties' overall relationship." *TAPCO Underwriters*, 2014 WL 7228711, at *4; *cf. Sempra Energy Trading Corp. v. Algoma Steel, Inc.*, No. 00-CV-9227, 2001 WL 282684, at *6 (S.D.N.Y. Mar. 22, 2001) ("Most importantly, we must look to the language of the forum clause itself, which refers to 'any action or proceeding relating to *this agreement*.' . . . This would be odd language to use in order to supplement or amend [a separate agreement]." (emphasis in original) (record citation omitted)), *aff'd*, 300 F.3d 242 (2d Cir. 2002); *Anselmo v.*

*Univision Station Grp., Inc.*, No. 92-CV-1471, 1993 WL 17173, at *2 (S.D.N.Y. Jan. 15, 1993)

("[T]he forum selection clause by its terms applies only to litigation relating to 'this

[a]greement,' so it was not intended to govern disputes arising under the terms of earlier

contracts or agreements . . . ." (footnote omitted)).  The Court finds that the forum selection

clause at issue here does not supersede the arbitration provision, and delegation of arbitrability in

the First Services Agreement still stands.  Thus, it is for the arbitrator, and not the Court, to

determine the scope of the provision in the First Services Agreement, and "whether the [current]

dispute[] . . . fall[s] within th[at] scope." *TAPCO Underwriters*, 2014 WL 7228711, at *5; *see

also Bell v. Cendent*, 293 F.3d 563, 567–68 (2d Cir. 2002) (finding that the question of whether

the claims at issue fell under an agreement that contained a broad arbitration clause was "a

question of scope" that had been delegated to the arbitrator (footnote omitted)); *Maisel v.

McDougal Littell*, No. 06-CV-765, 2006 WL 1409019, at *3 (S.D.N.Y. May 22, 2006)

("Whether the scope of the arbitration clause can be construed to include [certain] claims is an

issue for the arbitrator . . . because the arbitration clause incorporates the rules of the AAA."

(record citation and parenthetical omitted)).

Plaintiffs also point to the provision in the Wind-Down Agreement in which MRE and

NewPoint "agree[d] to cancel the [First] Services Agreement . . . and all associated amendments"

as evidence that the First Services Agreement was "expressly canceled" and "completely

invalidated."  (Pls.' Reply Mem. 1 (emphasis omitted).)[12]  However, this, too, raises a question

---

[12] Defendants implore the Court not to consider this argument because, according to Defendants, Plaintiffs raised it only in their Reply, thus waiving the argument.  (Defs.' Sur-Reply Mem. 2.)  Although Defendants are correct that "arguments not made until a reply brief are waived," *Doe v. City of New York*, No. 15-CV-117, 2018 WL 6095847, at *8 (S.D.N.Y. Nov. 21, 2018) (citation omitted), the Court considers this argument because Plaintiffs included the Wind-Down Agreement as an exhibit with their initial Memorandum and highlighted the cancellation provision in a Declaration, (*see* Saracino Decl. ¶ 22).

of arbitrability.  First, Plaintiffs' argument with respect to this clause calls into question the validity of the full First Services Agreement, and not the validity of the arbitration provision itself.  "Where contracting parties have evinced a clear and unmistakable intent to delegate threshold arbitrability issues to an arbitrator, a court may not intervene unless a party challenges the delegation provision *specifically*."  *Foran v. Nat'l Football League*, No. 18-CV-10857, 2019 WL 2408030, at *3 (S.D.N.Y. June 7, 2019) (emphasis added) (citation, alterations, and quotation marks omitted) (finding that the plaintiff's invalidity argument implicated the contracts in their entirety, and not the specific delegation of authority to the arbitrator; thus, arbitrability of issues including the "scope, validity[,] and enforceability" of the contracts were reserved for the arbitrator); *Doctor's Assocs.*, 2018 WL 6061573, at *4 ("A party cannot avoid arbitration by arguing that the contract's arbitration provisions are generally invalid, even where a challenge to [a] delegation clause is implicit in the party's claim that the entire agreement to arbitrate is invalid." (citation omitted)); *cf. Gringas v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019) (finding that the plaintiffs challenged the arbitration clause specifically when they alleged that the delegation provision was fraudulent), *cert. denied*, 140 S. Ct. 856 (2020).

Second, Plaintiffs' argument with respect to the Wind-Down Agreement relates to the *continued* validity of the First Service Agreement, which is an issue for the arbitrator.  *See Int'l Eng'g & Constr. S.A. v. Baker Hughes*, 399 F. Supp. 3d 194, 203 (S.D.N.Y. 2019) (noting that because the party "agreed to be bound by provisions that clearly and unmistakably allow the arbitrator to determine her own jurisdiction over an agreement to arbitrate whose *continued existence and validity* is being questioned, it is the province of the arbitrator to decide whether a valid arbitration agreement exists" (emphasis added) (citation and quotation marks omitted)); *Winter Inv'rs, LLC v. Panzer*, No. 14-CV-6852, 2015 WL 5052563, at *8 (S.D.N.Y. Aug. 27,

2015) ("The [c]ourt takes no position on the merits of [the] [p]laintiffs' arguments that the . . . [a]greement has been terminated, repudiated or rendered impossible to perform . . . : These are issues for the arbitrator to resolve." (collecting cases)); *Trenwick Am. Reins. Corp. v. CX Reins. Co. Ltd.*, No. 13-CV-1264, 2014 WL 2168504, at *4 (D. Conn. May 23, 2014) ("[G]iven the presumption of arbitrability created by the broad arbitration clause . . . , we conclude that [the] issues presented by the subsequent agreement—for example, whether it terminates, modifies, or otherwise affects the [original] [a]greement . . . touch matters within the main agreement to be arbitrated and thus [must] . . . be decided by the arbitrator." (alterations and quotation marks omitted) (quoting *ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 27 (2d Cir. 2002)); *Lismore v. Société Générale Energy Corp.*, No. 11-CV-6705, 2012 WL 3577833, at *5 (S.D.N.Y. Aug. 17, 2012) (finding that even if an original agreement, which delegated arbitrability to an arbitrator, had been terminated by a later oral agreement, "such a dispute would be for an arbitrator to resolve" (record citation omitted)); *cf. In re Am. Express Fin. Advisors*, 672 F.3d at 130–31 (suggesting that a question of whether a settlement revoked a party's consent to arbitrate certain claims was a question of arbitrability to be decided by the court "unless the parties clearly and unmistakably provide[d] otherwise" (citation, brackets, and quotation marks omitted)).  Thus, because the Court has determined that the First Services Agreement "clearly and unmistakably" delegates issues of the "existence, scope[,] or validity of the arbitration agreement" to an arbitrator, *Contec Corp.*, 398 F.3d at 209, 211 (citation and quotation marks omitted), the effect of the Wind-Down Agreement on the arbitration provision in the First Services Agreement is for the arbitrator to decide.

### 2.  Non-Signatories

#### a.  Non-Signatory Defendants

Defendants argue that although NewPoint and MRE are the only signatories to the First and Second Services Agreements, "the relationship between the non-signatories and the claims warrants enforcement of the arbitration agreement as to all of the [P]arties."  (Defs.' Mem. 2.) While Plaintiffs argue that none of Defendants can arbitrate because "[t]here is no arbitration agreement governing these claims," they concede that NewPoint Holdings, Lion, and Pez Gallo "are owners of the NewPoint entities and that TREB is a brand name."  (Pls.' Opp'n 10.)

With respect to the non-signatory Defendants—NewPoint Holdings, Lion, Pez Gallo, and TREB— "where a party seeking to avoid arbitration is a signatory to an arbitration agreement which incorporates rules that delegate arbitrability questions to the arbitrator, a court need not reach the issue of whether a non-signatory may compel arbitration, because that is an issue properly resolved by the arbitrator." *Lapina v. Men Women N.Y. Model Mgmt. Inc.*, 86 F. Supp. 3d 277, 284 (S.D.N.Y. 2015) (citation omitted), *appeal dismissed*, No. 15-687 (2d Cir. Sept. 28, 2015).  "In order to decide whether arbitration of arbitrability is appropriate, a court must first determine whether the parties have a sufficient relationship to each other and to the rights created under the agreement." *Contec Corp.*, 398 F.3d at 209 (citation omitted).  For example, in *Contec*, the Second Circuit found that there was a "sufficient relationship" between the parties because (1) there was an undisputed relationship between one of the signatories and both corporate forms of the other signatory; (2) the signatory resisting arbitration had signed the original agreement; and (3) the dispute arose because the parties continued to conduct themselves subject to the original agreement, even after a change in the corporate form of one of the signatories. *Id.*  When such a sufficient relationship exists, a non-signatory may "compel

arbitration even if, in the end, an arbitrator were to determine that the dispute itself is not arbitrable because [the non-signatory] cannot claim rights under the . . . [a]greement." *Id.*

District courts have construed *Contec* to "suggest that a corporate relationship is a 'sufficient relationship.'" *Int'l Eng'g & Constr. S.A.*, 399 F. Supp. 3d at 202–03 (citation omitted) (determining that because the non-signatories had a "parent/subsidiary relationship" with one of the signatories, there was a sufficient relationship between them, and the question of arbitrability could be delegated to an arbitrator) (collecting cases); *cf. Holzer v. Mondadori*, No. 12-CV-5234, 2013 WL 1104269, at *9 (S.D.N.Y. Mar. 14, 2013) (finding that a non-signatory did not have a sufficiently close relationship to a signatory because the non-signatory was not, and never had been, "an officer, director, member, manager, employee, shareholder, or agent of [the signatory]," and thus arbitration of arbitrability could not be compelled).

Here, there is no dispute that NewPoint is related in corporate form to NewPoint Holdings, Pez Gallo, Lion, and TREB. Indeed, Plaintiffs "do not dispute that . . . Lion . . . and Pez Gallo are the owners of the NewPoint entities and that TREB is a brand name," (Pls.' Opp'n 10), refer to NewPoint and NewPoint Holdings as the "NewPoint entities," (*id.*), and further do not dispute that NewPoint Holdings is also a beneficial owner of NewPoint, (Loeffel Decl. ¶ 13). Plaintiffs also state that although they argue that overall, there is no agreement to arbitrate, they "are [not] trying to break up . . . [D]efendants into categories[] that some can arbitrate and some cannot." (Pls.' Opp'n 10.) Plaintiffs allege throughout their Amended Complaint that MRE had relationships with the non-signatory Defendants. For example, Plaintiffs claim that NewPoint and "its owner Lion" decided to "work under a contract arrangement" with MRE, thus creating the First Services Agreement, (Am. Compl. ¶ 39); that MRE provided officers of NewPoint and Lion with a "confidential .ppt file" in 2013, (*id.* ¶ 93); that NewPoint and "its TREB subsidiary"

benefitted from certain technology received from MRE and Lim, (*id.* ¶¶ 28–29 (footnote omitted)); and that Pez Gallo purchased NewPoint in April 2018, thus becoming the owner of NewPoint, (*id.* ¶ 26). *See Katsoris*, 237 F. Supp. 3d at 105–06 (finding that there was a sufficient relationship when the plaintiffs had alleged that a non-signatory was a "successor-in-interest or parent" to the signatory corporation (record citation and quotation marks omitted)). Finally, Plaintiffs continuously refer to Defendants as one entity throughout the Amended Complaint.  (*See, e.g.*, Am. Compl. ¶ 2 ("'NewPoint and its owners/affiliates' or the 'Defendants' . . . induced and wrongfully misappropriated . . . their proprietary software application.").)  *Cf. F5 Capital v. RBS Secs. Inc.*, No. 14-CV-1469, 2015 WL 5797019, at *5 (D. Conn. Sept. 30, 2015) (explaining that, under the doctrine of estoppel, "[a] party attempting to resist arbitration was estopped from doing so because it had treated arguably non[-]signatory companies and their signatory assignees 'as a single unit' in its complaint in a related lawsuit" (quoting *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 98 (2d Cir. 1999))).

Thus, "[w]hile the Court need not decide whether [NewPoint Holdings, Lion, Pez Gallo, and TREB are], in fact, bound by the arbitration agreement signed by [NewPoint and MRE], there is a sufficient relationship between the . . . entities on the current record to delegate this question to the arbitrator."  *Katsoris*, 237 F. Supp. 3d at 106 (citation, footnote, and quotation marks omitted).

### b.  Mr. Lim

Defendants argue that "because Mr. Lim joined in MRE's claims, he has asserted rights under the First Services Agreement and . . . is estopped to deny arbitration of this dispute." (Defs.' Mem. 24 (citation omitted); *see also* Defs.' Opp'n 10 ("Mr. Lim has asserted claims

derivative of and intertwined with the First Services Agreement and thus may not avoid arbitration.").)[13]  Plaintiffs do not respond specifically to this argument, instead stating that "none of the[] [non-signatories] can arbitrate . . . [because] [t]here is no arbitration agreement governing these claims."  (Pls.' Opp'n 10 (emphasis omitted).)

While issues of arbitrability with respect to non-signatories seeking to compel arbitration may be delegated to an arbitrator, the issue of whether a non-signatory may be compelled to arbitrate is for the Court to decide.  *See Oeschger v. GeneThera, Inc.*, 395 F. Supp. 3d 345, 350 (D. Conn. 2019) ("[W]hen a signatory to an agreement delegating issues of arbitrability seeks to compel a non-signatory to arbitrate arbitrability, it is the court—not the arbitrators—who resolve the issue of arbitrability." (record citation and quotation marks removed)); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Stucco Sys., LLC*, 289 F. Supp. 3d 457, 465, 467 (S.D.N.Y. 2018) ("[C]ourts have generally found that agreements that do not mention or reference a particular non-signatory do not clearly or unmistakably evidence an agreement by that non-signatory to have an arbitrator determine whether the agreement is arbitrable. . . . Accordingly, whether [a non-signatory] is to be a party to [an] . . . [a]greement[] is an issue for judicial determination first." (citations and quotation marks omitted)).  Therefore, with respect to Lim, the Court must determine "(1) whether [Lim and Defendants] have entered into a valid agreement to arbitrate,

---

[13] Throughout their briefing, Defendants seek to have the Court consider claims set forth in Plaintiffs' original Complaint, which appears to possibly allege breaches of the First Services Agreement.  (*See, e.g.*, Compl. ¶ 76 ("[T]he intent between [the] [P]arties regarding fair and legal use of the licensed application was made absolutely clear in the Master Services *Agreements*.  Here, . . . [D]efendants have violated survivable terms of this contract . . . ." (emphasis added)).)  Defendants argue that such statements constitute "judicial admission[s]." (Defs.' Mem. 16–17.)  The cases Defendants cite for this proposition, however, deal with *factual* admissions in earlier complaints, and not changes to a party's claims.  *See Austin v. Ford Models, Inc.*, 149 F.3d 148, 155 (2d Cir. 1998), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *In re Parmalat Sec. Litig.*, 421 F. Supp. 2d 703, 713 (S.D.N.Y. 2006); *Jones v. Capital Cities/ABC Inc.*, 874 F. Supp. 626, 630 (S.D.N.Y. 1995). Thus, these cases are not directly applicable to the revisions to Plaintiffs' Amended Complaint.

and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Express Fin. Advisors*, 672 F.3d at 128 (citation omitted).

"[A] non[-]signatory cannot be bound to arbitrate under a direct-benefit estoppel theory solely due to their association with a signatory."  *McKenna Long & Aldridge, LLP v. Ironshore Specialty Ins. Co.*, Nos. 14-CV-6633, 14-CV-6675, 2015 WL 144190, at *11 (S.D.N.Y. Jan. 12, 2015) (collecting cases).  Instead, the Second Circuit has determined that "third parties may be bound by arbitration agreements to which they are not a signatory in five situations: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel."  *Wu v. Pearson Educ., Inc.*, No. 09-CV-6557, 2010 WL 3791676, at *3 (S.D.N.Y. Sept. 29, 2010) (quotation marks omitted) (quoting *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 352 (2d Cir. 1999)).  With respect to estoppel, "[a] party is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause."  *Am. Bureau of Shipping*, 170 F.3d at 353 (citation omitted).  "The benefits must be direct—which is to say, flowing directly from the agreement."  *MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 61 (2d Cir. 2001) (citation omitted). By arguing that Lim has asserted rights under the First Services Agreement, thus estopping him from denying arbitration, Defendants argue that this exception applies.

Numerous courts have found that non-signatory parties are estopped from denying arbitration when they rely on or seek direct benefits under an agreement by, for example, bringing suit under that agreement.  *See Lapina*, 86 F. Supp. 3d at 285 (finding that a non-signatory could be compelled to arbitrate when he brought suit seeking to enforce the agreement that contained the arbitration clause); *Carvant Fin. LLC v. Autoguard Advantage Corp.*, 958 F. Supp. 2d 390, 397 (E.D.N.Y. 2013) (finding that the plaintiffs could not "rely on the contract,

when it works to [their] advantage, and repudiate it when it works to [their] disadvantage" by "avoiding arbitration of claims clearly within the ambit of the arbitration agreement" (citations, alterations, and quotation marks omitted)); *HD Brous & Co. v. Mrzyglocki*, No. 03-CV-8385, 2004 WL 376555, at *7–8 (S.D.N.Y. Feb. 26, 2004) (finding that the petitioner relied directly upon the agreement containing the arbitration provision to "claim benefits" in the litigation by, for example, citing the same agreement for certain assertions in his affidavit). However, here, Plaintiffs dispute whether MRE and Lim bring this Action under the First Services Agreement at all. (*See, e.g.*, Pls.' Mem. 7–8.) Thus, to decide whether Lim's claims are, as Defendants argue, "derivative of and intertwined with the First Services Agreement," (Defs.' Mem. 10), the Court would need to determine, for example, whether Lim's claims "come[] within the scope of the arbitration agreement," *In re Am. Express Fin. Advisors*, 672 F.3d at 128 (citation omitted). And, as the Court has already determined, for NewPoint, MRE, and the non-signatory Defendants, the First Services Agreement "clearly and unmistakably" delegates arbitrability, including issues of scope, to the arbitrator. Given that MRE and Lim bring identical claims, were the Court to decide now whether Lim is estopped from avoiding arbitration, it would invariably also determine the scope of the First Services Agreement with respect to MRE's claims, which is "for the arbitrators in the first instance to determine." *Offshore Expl.*, 986 F. Supp. 2d at 320.

As such, the Court finds that there is no reason to reach the question of the arbitrability of Lim's claims now, and, in the interest of efficiency, MRE and Defendants should first proceed to arbitration with respect to the arbitrability of MRE's claims. For example, were the arbitrator to decide that MRE's claims against Defendants are not arbitrable, there would be little reason for the Court to independently make this determination with respect to Lim. Conversely, were the

arbitrator to decide that MRE's claims are arbitrable, that decision may inform the Court's ultimate analysis of Lim's claims. *See Limonium Maritime S.A. v. Mizushima Marinera, S.A.*, No. 96-CV-1888, 1999 WL 46721, at *9 (S.D.N.Y. Feb. 1, 1999) (declining to reach the issue of whether non-signatories should be compelled to arbitrate under a theory of alter-ego liability until arbitration was completed with respect to the liability of the signatory parties), *aff'd*, 201 F.3d 431 (2d Cir. 1999) (noting that it is within the district court's discretion to "defer[] adjudication of the status of the non[-]signatories because there would be no need to address that issue if the ongoing arbitration was decided adversely").

Thus, Defendants' Motion is denied as to Lim without prejudice to renewal after the arbitrator's determination of arbitrability.

### 3.  Stay of Litigation

Defendants request that this litigation be stayed pending resolution of arbitration, "even if the MRE Parties assert any claims ultimately deemed non-arbitrable."  (Defs.' Mem. 24.) Plaintiffs attempt to oppose this request by calling it "forum shopping" and a "cagey ruse . . . to try . . . to somehow force AAA arbitration."  (Pls.' Opp'n 10–11.)

"The decision to stay the balance of the proceedings pending arbitration is a matter largely within the district court's discretion to control its docket."  *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 856 (2d Cir. 1987) (citation omitted).  "A discretionary stay is particularly appropriate where there is significant factual overlap between the remaining claims and the arbitrated claims."  *Winter Inv'rs, LLC*, 2015 WL 5052563, at *11 (collecting cases); *see also Moore v. Interacciones Glob., Inc.*, No. 94-CV-4789, 1995 WL 33650, at *7 (S.D.N.Y. Jan. 27, 1995) ("It is well-settled that claims are appropriately stayed when they involve common issues of fact and law with those subject to arbitration[,] or when the arbitration is likely to dispose of

issues common to claims against both arbitrating and non-arbitrating defendants." (collecting cases)).  "In such cases, a stay is warranted in part because the prior litigation or arbitration is likely to have preclusive effect over some or all of the claims not subject to arbitration."  *Winter Inv'rs, LLC*, 2015 WL 5052563, at *11 (citation omitted); *see also Danisco A/S v. Novo Nordisk A/S*, No. 01-CV-10557, 2003 WL 282391, at *4 (S.D.N.Y. Feb. 10, 2003) (finding that "imposition of a stay with respect to the entire action [wa]s within the [c]ourt's inherent authority to control its docket where . . . the issues [we]re substantially interrelated, the stay w[ould] not prejudice significantly . . . the non-signatory party . . . , and the stay [wa]s in the interests of judicial economy" (footnote omitted)).

Here, a discretionary stay is warranted.  There is significant factual overlap between MRE's claims against Defendants and Lim's claims against Defendants, and the ultimate determination of the arbitrability of MRE's claims by an arbitrator will inform the Court's decision on the arbitrability of Lim's claims.  *See Maritima de Ecologia, S.A. de C.V. v. Sealion Shipping Ltd.*, No. 10-CV-8134, 2011 WL 1465744, at *5 (S.D.N.Y. Apr. 15, 2011) (finding that, even though arbitration would not prove "controlling of the action before the court," a stay was appropriate because the arbitration "[would] have a significant bearing on th[e] case" (citation and quotation marks omitted)).  Thus, this Action is stayed pending the outcome of arbitration.

### III.  Conclusion

For the foregoing reasons, the Court grants Defendants' Motion To Compel Arbitration with respect to Plaintiff MRE and denies without prejudice Defendants' Motion To Compel Arbitration with respect to Plaintiff John Lim.  The Court denies Plaintiffs' Motion To Stay

and/or Vacate Arbitration.  The case is stayed pending arbitration, and the Court's temporary stay on arbitration, (*see* Dkt. No. 26), is lifted.

The Clerk of Court is respectfully directed to terminate the pending Motions, (Dkt. Nos. 13, 20).

SO ORDERED.

DATED:       May 18, 2020
             White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE